**Wallace D. BRUNTON, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. C–2–81–523.

United States District Court, S. D. Ohio, E. D.

June 30, 1981.

---

Denis J. Murphy of Carlile, Patchen, Murphy & Allison, Columbus, Ohio, Walter H. Fleischer of Cole & Groner, Washington, D. C., for plaintiffs.

Thomas S. Martin, Acting Asst. Atty. Gen., James C. Cissell, U. S. Atty., S. D. Ohio, Albert R. Ritcher, Asst. U. S. Atty., Columbus, Ohio, Paul Blankenstein, Raymond M. Larriza, Dept. of Justice, Washington, D. C., for defendant.

## OPINION AND ORDER

KINNEARY, District Judge.

Nineteen plaintiffs who are Democrats and were formerly employed as State Directors of the Farmers Home Administration [FmHA] of the United States Department of Agriculture [USDA], filed this suit seeking injunctive relief from their political patronage dismissals by President Reagan's Administration. Before the Court are plaintiffs' motion for a preliminary injunction and defendant's motion to dismiss or, in the alternative, for summary judgment.

Plaintiffs[1] allege that they were dismissed from their federal employment by the new Administration solely because they are Democrats. Thus, on constitutional grounds they contend that under the United States Supreme Court's decision in *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the dismissals violated their First Amendment right to hold public employment without regard to political affiliation. Furthermore, twelve plaintiffs[2] challenge the dismissals under the Veterans' Preference Act, 5 U.S.C. § 7512. Accordingly, plaintiffs filed motions for a temporary restraining order and a preliminary injunction requesting the Court to restore them to their former positions with all the related benefits.

*Motion For Dismissal Or Summary Judgment*

The defendant, United States, has responded to plaintiffs' suit by inviting the Court to dismiss the complaint or, in the alternative, to grant summary judgment. To do either of these, the Court declines the invitation.

I.

Supporting its motion to dismiss, the government argues, first, that plaintiffs fail to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6), F.R. Civ.P. The Court fails to see any merit to this contention.

■ In reviewing the motion, all allegations in the complaint are taken as true and the complaint is construed liberally in favor of the party opposing the motion. *Davis H. Elliot Co. v. Caribbean Utilities Co., Ltd.*, 513 F.2d 1176, 1182 (6th Cir. 1975). The motion should not be granted under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Davis H. Elliot Co. v. Caribbean Utilities Co., Ltd., supra*. Clearly, the plaintiffs' complaint, alleging political patronage dismissals, states a First Amendment claim upon which relief may be granted, on the basis of *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

■ Secondly, the government contends that plaintiffs have failed to exhaust the administrative remedies established by the

---

1. The nineteen plaintiffs, along with the states in which they served as FmHA State Directors, are: John F. Apitz (Minnesota); Wallace D. Brunton (Ohio); William E. Burnette (Kentucky); Brian D. Burns (Vermont); Drew Cloud (New Mexico); William E. Curry (Massachusetts); Lawrence E. Dahl (Wisconsin); John D. Daniello (Delaware); Frederick W. Denfield (Missouri); John T. Denyer (Kansas); Manuel O. Dominguez (Arizona); Wallace B. Edland (Montana); James W. Facemire (West Virginia); J. Fred King (Pennsylvania); Rudolph W. Knoll (Wyoming); Joe T. McCarter (Idaho); Keith P. Sattler (Washington); Karl Gene Smith (South Carolina); Jack M. Weiland (South Dakota).

2. Plaintiffs Brunton, Cloud, Curry, Denfield, Denyer, Edland, Facemire, Knoll, McCarter, Sattler, Smith, and Weiland.

civil service statutes and regulations [3] and, therefore, this Court lacks subject matter jurisdiction, pursuant to Rule 12(b)(1), F.R. Civ.P. With almost equal brevity the Court also rejects this argument.

In *Elrod v. Burns, supra* at 373, 96 S.Ct. at 2689 Justice Brennan on behalf of a plurality of the U. S. Supreme Court, stated that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Another division of this court in *Kelly v. United States Postal Service*, 492 F.Supp. 121 (S.D.Ohio 1980), relied on the above language in *Elrod* in granting preliminary injunctive relief to U. S. postal employees who were discharged for wearing at work tee-shirts bearing a foreign political message. After citing to the exhaustion doctrine and its favored application in lawsuits, this court explained that

> [t]his policy gives way however when the employee suffers irreparable harm. Plaintiffs here have alleged violation of their First Amendment rights. Such violation would as a matter of law, constitute irreparable harm. Hence, this Court need not await exhaustion of the grievance-arbitration process plaintiffs have pursued. (Citations omitted).

*Kelly v. United States Postal Service, supra* at 127. *See also Gilley v. United States*, 649 F.2d 449 (6th Cir., 1981).

**II.**

The Court has also concluded that the defendant's alternative motion for summary judgment should be denied. In support of its motion, the government has presented affidavits from two top officials in the USDA and the FmHA, and the current USDA's job description for the FmHA State Director position. Based on these, the government argues that the former role and duties of the plaintiffs as State Directors are conclusively established as being ones of a confidential and policymaking na-ture, thus falling within the parameters of justifiable political patronage dismissals set forth in *Branti v. Finkel, supra.*

■ Rule 56, F.R.Civ.P. provides that the Court may grant defendant's motion for summary judgment only "if the pleadings . . . together with the affidavits, . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." While the government's exhibits lend support to their claim, they do not conclusively "demonstrate that party affiliation is an appropriate requirement for the effective performance" of the plaintiffs' former positions as FmHA State Directors. *Branti v. Finkel*, 445 U.S. at 518, 100 S.Ct. at 1294. The plaintiffs' affidavits present disputed issues of material fact regarding the actual role of the plaintiffs as former State Directors, and for this reason the Court is unwilling to take summary action.

*Motion For Preliminary Injunction*

*I. Introduction*

The Court held an evidentiary hearing on plaintiffs' motions for injunctive relief on April 30, 1981. In addition to many exhibits, the testimony of Robert R. Shaw, Frank W. Naylor, Jr., Dwight O. Calhoun, Joseph A. O'Mara and plaintiff Wallace D. Brunton was received.

Wallace Brunton, one of the nineteen plaintiffs in this action, was the FmHA State Director of Ohio until his discharge on May 31, 1981. Robert Shaw, on the other hand, is the State Conservationist for Ohio in the USDA's Soil Conservation Service. His testimony essentially portrayed the similarities and differences between his position within that particular agency compared to Brunton's position within the FmHA.

The testimony of Messrs. Naylor, Calhoun, and O'Mara was offered primarily to explain the past, present, and future duties

---

**3.** The Civil Service Reform Act of 1978, 5 U.S.C. §§ 1101 *et seq.* (1976 ed., Supp. III), grants federal employees procedural redress for adverse personnel actions taken against them. The Merit Systems Protection Board [MSPB] was established to adjudicate employee dismissals, 5 U.S.C. §§ 7701 *et seq.*, and the Office of Special Counsel to the MSPB is charged with the duty to investigate employee complaints and seek corrective action before the MSPB.

of FmHA's State Directors and the circumstances surrounding the discharge of the plaintiffs. Frank Naylor is President Reagan's nominee for the key USDA position of Under Secretary for Small Communities and Rural Development. Prior to his appointment he prepared the original rural development draft on behalf of the President's Transition Committee. He has also served as the Associate Administrator of FmHA under former Secretary Earl Butz and as FmHA's Acting Administrator under former Secretary Robert Bergland.

Dwight Calhoun has been employed within the FmHA for nearly twenty-five years, the last four serving officially as the Assistant Administrator for Community Programs. Since February 11, 1981, he has been serving in an interim appointment as Acting FmHA Administrator until Charles Schuman, the new Administrator appointed by the President, is confirmed by the Senate. Finally, Joseph O'Mara is the Acting Director of the Personnel Division of the FmHA and prior to his appointment on March 4, 1981, he was Chief of the Classification Branch of the Personnel Division.

At the hearing, the Court denied plaintiffs' motion for a temporary restraining order but took under advisement the motion for preliminary injunctive relief (tr. 179). Based upon the evidence adduced at the hearing, the pleadings, the memoranda of the parties, and other materials before it, the Court now makes the following preliminary findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

## II. Findings of Fact

### A. The Farmers Home Administration.

The Farmers Home Administration is a comprehensive farm and rural development agency within the United States Department of Agriculture. It is the principal credit agency of USDA which dispenses billions of dollars in federal assistance for the operation of generally four FmHA program categories (tr. 13–14; plaintiffs' exhibit V):[4] (1) the housing loan program assisting single and multiple families with low to moderate income residing in rural areas; (2) the farmer program loans designated to assist commercial farming enterprises; (3) the community loan programs, which aid in the construction of water and waste disposal projects and community facilities such as hospitals, swimming pools, and golf courses; and, (4) the business and industrial development loans (tr. 13–17, 35, 125; plaintiffs' exhibit W).

The organizational structure of the FmHA is of a highly decentralized nature. There is a national office in Washington, D.C. where the Administrator heads the agency. The number two line officer under the FmHA Administrator is the Associate Administrator, the senior loan officer at the national office in charge of reviewing the FmHA loans and grants approved by the forty-six State Directors. Next in the agency's hierarchy are several Assistant Administrators and three Deputy Administrators, all of whom share in the responsibility for carrying out the agency programs and operations at the national level. (tr. 119; affidavit of Frank Naylor, ¶ 6, appended to defendant's motion to dismiss).

4. Specifically, the FmHA is in charge of administering the Consolidated Farm and Rural Development Act, 7 U.S.C. §§ 1921 et seq., and it is authorized by § 502 of Title V of the Housing Act of 1949, 42 U.S.C. § 1472, to extend financial assistance to qualifying persons residing in rural areas.

The regulations state:
The basic objective of the Farmers Home Administration (FmHA) in making section 502 loans is to assist farmowners and other persons who will live in rural areas to obtain decent, safe, and sanitary dwellings and related facilities. . The purpose of these loans is to give families, who do not have sufficient resources to provide such dwellings and related facilities on their own account and cannot obtain the necessary credit from other sources on terms and conditions they reasonably can be expected to meet, an opportunity to have adequate homes.
7 C.F.R. § 1822.2 (1980).

FmHA is authorized to provide financial assistance either by direct loans through the Secretary of Agriculture pursuant to § 502 of the Housing Act, 42 U.S.C. § 1472, or by insured or guaranteed loans pursuant to § 517 of the Act, 42 U.S.C. § 1487, and the regulations, 7 C.F.R. §§ 1841.46 et seq.

In addition to the national office, FmHA has 46 state offices, some of which serve more than one state; 306 district offices; and 1989 county offices. Because the implementation of its programs and the dispersements of its federal loans and grants are primarily at the state and local level, FmHA is considered a unique agency within the federal government (tr. 129). Approximately eighty-six percent of the employees of the entire agency work in the state field offices. The FmHA State Directors are the officials primarily responsible for the efficient operation of the FmHA programs at the state and local levels. (affidavit of Naylor, ¶¶ 7–8, 11–12).

From outside to inside the agency, the chain of command or direct line of decision-making authority is as follows: the President of the United States; the Secretary of Agriculture (John Block); the Secretary of Agriculture for Rural Development and Small Communities (nominee Frank Naylor), who is responsible for the programs administered by both the FmHA and the Rural Electrification Administration; the FmHA Administrator (nominee Charles Schuman); and then, the FmHA State Directors who manage and supervise the FmHA programs throughout their state jurisdictional areas (tr. 119, 135–36).[5]

5. In 1980, during President Carter's Administration, the USDA created within the FmHA the new field position of Area Directors. The six Area Directors were political appointees and designated as non-career Senior Executive Service. They possessed duties and responsibilities substantially greater than those of the State Directors and in the chain of command they were between the State Directors and the FmHA Administrator. President Reagan's Administration abolished these positions on April 16, 1981. (tr. 91–92; affidavit of Naylor, ¶ 21).

6. There are two broad categories of federal employment, the "competitive service," with the "career service" as a subset, and the "excepted service." The competitive civil service includes any position for which an exam is given, while the excepted service includes positions "for which it is not practicable to examine." In 1953 the Civil Service Commission, now the Office of Personnel Management, designated the FmHA State Director position in the excepted service, as a Schedule A position. The three schedules, or classifications, in the

**B. FmHA State Directors.**

*(1) Civil Service Classification and USDA Official Job Description.* When President Reagan took office on January 20, 1981, the FmHA State Director's position, grade GS–14—15, was classified as "Schedule A" within the "excepted service."[6] The Schedule A jobs are defined as "positions other than those of a confidential or policy determining character for which it is not practicable to examine . . . ." 5 C.F.R. § 6.2 and §§ 213.3101 *et seq.* (1980). Also during this same time period the USDA official position description stated, in part, that the State Director:

> Formulates and implements the total FHA program within the State jurisdictional area, exercising executive leadership in developing and implementing operating principles . . . necessary to promote and achieve the purposes and objectives of the overall FHA programs . . . . Gives emphasis to development of annual goals and long-range plans of operations . . . and maintains continuing managerial follow-through . . . . (plaintiff's Exhibit K).

On March 23, 1981, the President issued Executive Order 12300,[7] which essentially

excepted service are defined in the regulations as follows:

> Schedule A. Positions other than those of a confidential or policy-determining character for which it is not practicable to examine shall be listed in Schedule A.
> Schedule B. Positions other than those of a confidential or policy-determining character for which it is not practicable to hold a competitive examination shall be listed in Schedule B. Appointments to these positions shall be subject to such noncompetitive examination as may be prescribed by OPM.
> Schedule C. Positions of a confidential or policy-determining character shall be listed in Schedule C.

5 C.F.R. § 6.2 (1980).

7. EXCEPTIONS FROM THE COMPETITIVE SERVICE
By the authority vested in me as President of the United States of America by Sections 3301 and 3302 of Title 5 of the United States Code, having determined that it is necessary and warranted the conditions of good administration that certain positions in the Depart-

reclassified the State Director position in the excepted service from "Schedule A" to "Schedule C." The Schedule C jobs are defined as "positions of a confidential or policy-determining character ...." 5 C.F.R. § 6.2 and § 213.3301 (1980). As Mr. Naylor stated, the Executive Order served to equate the civil service classification of the position with its true character in past Administrations, and to emphasize President Reagan's desire to further strengthen the role of the FmHA State Director in his Administration (tr. 144–45).

Following the issuance of the President's Executive Order and consistent with its emphasis, a new job description was prepared by the FmHA Personnel Division (tr. 212–13). In expanding the duties and responsibilities of the position the "Introduction" states that the State Director

> serves as the representative of the Secretary and the Administrator responsible for formulating and implementing FmHA assistance and community and rural development programs within the State jurisdictional area. The incumbent also participates with the Administrator and other top management officials in determining and developing overall agency policy, plans, and programs. As State Director, the incumbent advises the Administrator of local responses to National policy, adapts programs and policies to meet local conditions and needs, and recommends changes in National policy and operating procedures. He is the Administration's community and rural development policy advocate before State and local governments, the public, and the news media. It is essential that the incumbent warmly espouse the Administration's goals in rural assistance and development, and maintain the Administrator's trust and confidence. (plaintiffs' Exhibit T).[8]

ment of Agriculture ought to be excluded from the coverage of Section 2302 of Title 5 of the United States Code, and excepted from the competitive service because of their confidential, policy-determining, policy-making, or policy-advocating character, in order to ensure their deep involvement in the development and advocacy of Administration proposals and policies and to ensure their effective and vigorous implementation, it is hereby ordered that Section 6.8 of the Civil Service Rule VI (5 C.F.R. 6.8) is amended by adding the following new subsection:

"(c) Within the Department of Agriculture, positions in the Agricultural Stabilization and Conservation Service the incumbents of which serve as State Executive Directors and positions in the Farmers Home Administration the incumbents of which serve as State Directors or State Directors-at-Large shall be listed in Schedule C for all grades of the General Schedule."

**8.** The remaining portion of the official job description (plaintiffs' Exhibit T), setting forth the principal duties and responsibilities of the State Director, provides in pertinent part that he:

1. Participates with the FmHA Administrator and top officials in the planning, organizing, implementing, coordinating, and directing of FmHA programs, policies and practices. Recommends policy changes to meet current and specific needs or goals of programs within the assigned area.

2. Represents the President, the Secretary, and the Administrator in meeting with state and local government officials on rural development matters, advocating the Administration's position on issues of intergovernmental cooperation and mutual interest and involvement. Plans and executes a dynamic public relations program, utilizing all ... resources, including mass media, to accomplish better understanding by ... the general public. Explains and defends the Administration's rural development, credit, farm and home management and supervision policies, .... Secures essential cooperation, services, or assistance from outside sources in furthering program goals.

... [R]epresents the Secretary and the Administrator in ... continuing contacts with other public and private organizations and the public ... to explain ... programs, resolve problems and promote and negotiate effective utilization of available resources in furthering community and rural development objectives. As an advocate for the Administration's farm lending and rural development policies, furnishes guidance and directs the dissemination of information to State and local officials, borrowers, and the public.

3. Participates in the development, formulation, coordination, and implementation, in conjunction with the other agency management officials, of overall FmHA operating and administrative programs, policies and plans within the assigned state area. Develops ... procedures, and instructions necessary in administering the programs; and managing [FmHA state offices]. Plans, targets ... resources (manpower, money and materials) in accordance with established

*(2) Nature of the Position.* Plaintiff Brunton testified that the FmHA organizational structure in Ohio is fairly typical of other states (tr. 17). As the State Director in Ohio, Brunton supervised a substantial staff which numbered approximately 160 employees, located in the FmHA state office, five district offices, and thirty-three county offices (tr. 13, 19).

The FmHA county offices, some serving more than one county, are managed by County Supervisors. It is at this level of the agency where most loan and grant applications are prepared and ultimately where federal assistance is received by farmers, businesses and residents. (tr. 16–17; affidavit of Naylor, ¶ 9). The county offices, in turn, are supervised by one of the five District Directors. In addition to the oversight function of the FmHA district offices, "group-type loans" are made for such things as multiple housing projects and water and waste disposal systems. (tr. 16–17).

The FmHA State Director supervises and manages the work performed in these statewide offices, ultimately bearing the responsibility for the overall operations of the FmHA programs (affidavit of Naylor, ¶¶ 11–12). He is the "personnel chief, . . . responsible for the hiring, recruitment, . . . assignment, training . . . [and the] disciplin[ing]" of employees (tr. 19). And to ensure that the FmHA programs are correctly operated he issues bulletins "to clarify points of national instructions of interpretation" and to point out "certain trends that are appearing within programs that appear to be violations or irregularities (tr. 26)."

One of the most important functions the FmHA State Director performs in administering the FmHA programs is deciding which project applications within a particular program category will receive funding (tr. 103, 114). Billions of dollars are spent nationally in the implementation of FmHA

agency goals and objectives . . . . Provides leadership and coordination to [FmHA state offices] in developing and implementing operation and management plans . . . necessary to . . . achieve the . . . objectives of FmHA programs. Gives emphasis to development of the Administration's . . . policies and plans of operation . . . and maintains continuing follow-through to assure . . . accomplishment of the Administration's goals.

4. [C]onducts a program to review operations within the state area to evaluate program . . . effectiveness . . . . Analyzes program . . . information to determine trends, detect weaknesses . . . which affect Administration policies . . . . Provides for the preparation of special instructions, or staff advisory assistance to improve operating effectiveness . . . . Insures that each activity of the overall state program receives appropriate emphasis which properly reflects the Administration's goals, . . .; and recommends to the Administrator and top agency officials appropriate revisions in national program emphasis. Institutes positive action to resolve appeals, complaints, problems, and irregularities; . . . . [U]nresolved problems which cannot be settled are forwarded to the Administrator for direction. Exercises delegated authority for making and servicing loans, implementing the whole range of the Administration's financial assistance activities.

5. Directs FmHA lending, community and rural development activities . . . insuring that the resources of the agency are . . . utilized

for the attainment of the Administration's program objectives, including seeing that all statutory authorities under the Consolidated Farm and Rural Development Act, Title V of the Housing Act of 1949, and Title II of the Energy Security Act, are fully carried out. Directs the state-wide implementation of the agency's EEO plan . . . . Implements, and is accountable for a program of recruitment, hiring, training, upward mobility and promotion for compliance with EEO program plans and objectives. * * *

6. Insures the application of sound administrative practices in carrying out the state program. Places continuing emphasis on management improvements, manpower utilization and cost reduction principles . . . . In the interest of effective staffing, maintains contacts with . . . sources of recruitment. Exercises employment, classification, and/or adverse action authority, as delegated by the Administrator, in accordance with the policies and regulations in the Federal and Department Personnel Manuals and supplementing FmHA Instructions.

7. Directs the development and conduct of essential training programs . . . to insure thorough understanding . . . and effective application of . . . programs, policies, procedures and systems by personnel throughout the area.

8. Performs related functions as required.

programs. The funds available for each state and for each FmHA program category within the particular state are set by the FmHA national office according to allocation formulas (tr. 19, 24–25, 60, 133–34; plaintiffs' Exhibit W). For example, for fiscal year 1981, Ohio's allocation for the community loan program is about thirty-seven million dollars and, more specifically, the allocation for community facility projects within that program category is about seven million dollars (plaintiffs' Exhibit W, Attachment A–1).

Because the applications for these funds far exceed their availability, FmHA State Directors play a vital role in evaluating the competing project applications within this program category, assigning them a priority and ultimately deciding which projects should receive funding. As Mr. Naylor explained:

[Community facility projects] is a broad category of projects which fit in that definition, and probably that's one of the better areas of examples of where the state director's judgmental decision becomes important. Those projects could include swimming pools, they could include golf courses, fire houses, hospitals, any wide range of facilities which a local community may decide it has a desire to have. Quite frequently in most states these days substate planning districts have been formed to try and master plan the needs of a several multi-county area, and to try and assign some sort of priorities. Obviously, the desires of many communities exceed the funds that are available from the government, and the state directors must make a determination whether the types of projects being proposed are important, whether they are within the scope of the objective of the administration, or whether they fall into a category that the administration no longer feels it is appropriate to be involved in, for example, the golf course type of loan which at one time was heavily pushed and widely used around the country until it became apparent that it was not in the best interest of public policy to continue that. Then it became

the state director's responsibility at that time to go back to local and state governments and articulate that change in policy and enforce it. (tr. 125–26).

Consequently, as a result of this function the State Directors are primarily responsible for insuring that the nationally allocated funds are expended within their state areas in a manner consistent with the Administration's agricultural and rural development policies.

FmHA State Directors also have significant input as to the determination and formulation of these national policies. Annually, the State Director is responsible for the preparation of the state's management and targeting plan, which essentially explains how the state will be operated within the national budget restrictions. Short and long-term goals are emphasized and the Director explains the application of personnel, loan and grant funds, and other state resources toward competing projects within the FmHA programs. Once the plan is in final form, it is used by national agency officials for policy planning and decision-making purposes. (tr. 40–41, 57–59, 107–111).

Frequent contact is maintained between the State Directors and the FmHA Administrator and other officials in Washington with regard to the overall operations of FmHA programs. In addition, the Directors provide input as to community feedback on existing national policies or particular program emphasis, and suggest possible adjustments in such policies to better serve the state or local interests. (tr. 119–20, 130–31, 138, 168–69). According to Mr. Naylor:

A great deal of our policy formulation will result from the bubbling up, if you will, from local and state governments through our leading federal officials of the policies and directions which these people feel will best serve the interests of local communities. We expect our state directors to listen to those and have a discussion and report and talk with these leaders and then to bring that information forward to the Administrator for

Farmers Home Administration to help us formulate public policy in the rural development area. It will become the key factor in achieving that objective, which is a fundamental objective of the Reagan Administration. (tr. 126–27).

Another primary function of the FmHA State Director is in acting as the key representative and spokesman for the agency, communicating and advocating the national policies of the incumbent Administration. On the surface, this includes conducting a statewide public relations campaign informing the public about FmHA programs (tr. 21, 56), and explaining to the press and media through press releases, interviews and conferences the rationale behind the special emphasis the Administration may place on certain FmHA programs. (tr. 56–57). To a much more significant extent, the State Directors from time to time become involved with state and local government officials and national congressional leaders on FmHA policy matters.[9]

Plaintiff Brunton, for example, has served as the chairman of the Ohio Rural Development [ORD] Committee and he was instrumental in the creation of the ORD Task Force. These organizations came about as a direct result of the previous administration's desire to seek the cooperation of state officials and agencies in the national effort to improve agricultural and rural development.[10] The ORD Committee was composed of representatives of state agencies as well as officials from federal agencies outside the USDA interested in rural development. Its objective was to reach interagency solutions on a variety of rural and social problems such as "the diminishing supply of agricultural land and its long-term effect on our food supply" (tr. 23). The ORD Task Force was formed to implement the Carter Administration's plan of encouraging the participation of the state governors in their states' rural and community development. Although in Ohio the governor's office declined this invitation, Brunton and the Task Force continued to carry out the same objectives by targeting funds toward priority programs for rural development. (tr. 23–24, 50–56, 128–29).

On his being the key agency representative and spokesman to Congressional leaders from Washington, Brunton stated that he personally has responded to frequent inquiries from Congressmen concerned with the operation of FmHA programs and the approval or disapproval of certain projects (tr. 42–46, 37–39). Also, on one occasion he was asked by the Ohio Congressional Delegation to deliver a speech in Washington to about twenty Congressmen. The purpose of the speech was to lobby on behalf of rural Ohioans and obtain additional resources for Ohio's programs (tr. 46–49; defendant's exhibit 1).

A FmHA State Director enjoys a great deal of discretion in performing his primary duties in the FmHA. The supervision from the national office is "very, very broad and limited" (tr. 132). As previously mentioned, within any particular FmHA program category, a State Director must decide which one among the competing projects will be funded (tr. 169–70). More specifically, he

---

9. As Mr. Naylor reasoned:

Throughout the history of this agency, and that is frankly, I think, why you have seen these changes with each administration, is that the administration leaders have recognized that this one individual, probably more than any other, has an enormous impact on the credibility of the administration's programs as they are articulated from Washington. They know the local conditions. They understand how the national policies as they come down will impact on their local areas. That's recognized by Government officials and it is recognized by those in the media and the press. (tr. 130).

10. *See* the Rural Development Policy Act of 1980, 7 U.S.C.A. §§ 2204, 2204a, 2204b *amending* Rural Development Act of 1972, 7 U.S.C.A. §§ 2651 *et seq.*

The 1980 Act directs the USDA Secretary to provide leadership within the executive branch and assume responsibility for coordinating a nationwide rural development program using the services of executive branch departments and agencies. The Act also established Mr. Naylor's position of Under Secretary for Small Community and Rural Development. For the legislative history and purpose of the Act, Pub.L. 96–355, *see* 1980 U.S.Code Cong. and Adm.News p. 2806 *et seq.*

has unlimited authority to approve those loans secured by general obligation bonds, tax exempt bonds or some other tax based security (tr. 106). On water or waste disposal projects, he has unlimited authority to approve those projects under two million dollars, and with projects greater than this ceiling, his recommendation of approval to the national office is almost always accepted. Even more significantly, no project in any FmHA program category, regardless of size, can be federally funded without a State Director's approval. He may reject particular projects without the knowledge or review, let alone the imprimatur, of the national office. In essence, the State Director exercises a veto power over all projects and his decision ultimately reflects whether a particular project is in the best interest of the locality and the state given the national policies on agricultural and rural development. (tr. 106–07, 112, 131).

For these reasons, the FmHA Administrator must place great reliance on the forty-six FmHA State Directors to implement the FmHA programs in a manner consistent with the rural development policies of the Administration. As Mr. Naylor explained:

> The Administrator, when I was in that position and my predecessor, and I believe those that have come since then, relied heavily upon the capability and the judgments of that state director to execute and carry out the programs and the policies laid down by the administration. It was very difficult, if not impossible, for us to know any deviation on their part until it was long after the fact and they had enjoyed, in our administration and in the one that is being formulated now, a high degree of confidence and special trust .... (tr. 148–49).

Finally, it appears that the role of the FmHA State Director will be of even greater importance in President Reagan's Administration. The testimony of Mr. Calhoun and Naylor, the President's Executive Order, and the USDA's new position description all indicate the new Administration's intention of changing some of the operations and policies of the FmHA and having the State Director assume a stronger role in achieving these. (tr. 96–98, 123–24, 127–28, 130, 156–59; affidavit of Naylor, ¶ 22). For example, while not all of the new Administration's policies have been determined or disclosed during the first six months of Ronald Reagan's presidency, one thing that is clear is that federal government spending is being significantly reduced. And as a consequence, these spending reductions are having an obvious and dramatic effect on FmHA. (tr. 96–98, 156; plaintiffs' Exhibit V). With fewer funds available for competing projects, state and local commercial lenders will be increasingly encouraged to finance these projects. (tr. 156–58).

Being eminently qualified to explain the past and future role of FmHA State Directors, and using as an example the FmHA community loan program's water and waste disposal projects, Mr. Naylor stated:

> Water and waste program is one of the more critical programs in the Farmers Home Administration. Typically, I think a state director, for example, would initially articulate the policy, the emphasis, the direction which a particular administration, in this case, the Reagan Administration, intends to take with that program, and to indicate to the state and government officials and local officials where our priorities and intentions would be.
>
> As a result of that, local governments and state governments and substate planning districts will develop projects that are appropriate to their particular community needs, particularly those with relation to health and safety. (tr. 120).

> \*     \*     \*     \*     \*     \*

> [W]e presently have nationwide some three thousand applications for water and sewer projects, and we will only be able to fund fourteen hundred this year on a national basis. It then falls to the state director within the funds allocated to him to determine those which best meet the objectives of the administration and best meet the needs of the communities which

are going to be serviced and to allocate those funds to those projects during the year by selection process. (tr. 122).

\* \* \* \* \* \*

For example, there was a project several years ago in South Carolina, which was a multi-county water project, to improve water delivery in an industrializing, urbanizing area. The state director worked very closely with the multi-government unit in determining and helping them to develop the project. It was brought forward to the state level and here I think an important distinction needs to be made which is important: There are a number of staff personnel both at the state office level and the national office level who are—precisely they are technicians and pragmatic in nature. They make a technical evaluation of the financial feasibility of a project. They do not determine the priority of the project, nor do they determine its relative importance within the funds available. They simply look at it; is it technically feasible from a construction standpoint, and is it financially sound from a lending standpoint? At that point it becomes the state director's responsibility to determine if this project best represents the objectives of the administration and the needs of his area; and, if so, to go forward with the necessary approvals to carry that project out in conjunction with local government and state officials, and that is what happened in this instance in South Carolina. That ultimate responsibility in executing the administration's policy and its thrust was in the hands of that state director as it had been in the past and will increasingly be, and substantially more so under the new administration. (tr. 121–22).

\* \* \* \* \* \*

[I]t is this administration's intention to seek out much greater commercial participation in [water and waste disposal] projects. It is incumbent upon the state director to advocate that policy to commercial lenders, to government officials, in an attempt to bring them together to fund a greater proportion of the projects through commercial funding and to isolate and identify those projects which cannot obtain that kind of financing and selectively direct the government funds more sufficiently to those projects most in need. That is going to require some significant effort by the new state directors because this is a major shift in policy from past administrations, and it is going to require a great deal of advocacy on the part of those people in those positions for this to succeed. (tr. 123–24).

*(3) Comparison to Other Positions in the Competitive Service.* The plaintiffs have attempted to demonstrate to the Court that there are two other employees of the USDA, Dwight Calhoun and Robert Shaw, who are nonpolitical appointees with duties that parallel those of the FmHA State Director. We find otherwise in concluding that the FmHA State Director positions are dissimilar to those held by these individuals.

As stated earlier, Dwight Calhoun is a career service employee and officially a FmHA Assistant Administrator in charge of Community Programs. Although Mr. Calhoun is one of the top agency officials at the national level, his role is significantly different than that of a State Director. Unlike the plaintiffs, Mr. Calhoun is not in the chain of command or the direct line of decision-making authority which is delegated directly from the FmHA Administrator to the State Directors (tr. 119, 135–36). Whereas no particular project, for example, can receive federal assistance without the State Director's approval, the Assistant Administrators have no such approval authority (tr. 106–07).

Robert Shaw, on the other hand, is Ohio's State Conservationist for the Soil Conservation Service [SCS], "a technical organization within the USDA" responsible for administering nine programs dealing with soil and water conservation (tr. 180, 183–84). In its largest program, called the conservation operations technical assistance program, the SCS might, for example, provide assistance to landowners by developing technical plans and designing conservation measures to solve excessive erosion, drain-

age or water quality problems (tr. 183, 190–91). As the SCS State Conservationist for Ohio, Mr. Shaw supervises approximately 290 employees within the state (tr. 181); deals with national, state and local officials (tr. 184–86); and, formulates detailed plans for the implementation of SCS programs (tr. 185). These duties notwithstanding, Mr. Shaw's role can be primarily characterized as technical in nature. He does not possess the full scope of decision-making authority with regard to SCS programs as the State Directors do with FmHA programs.

*(4) Plaintiffs' Patronage Dismissals.* All nineteen plaintiffs are affiliated with the Democratic Party. Plaintiff Brunton stated he is a veteran of World War II and has been a registered Democrat in Ohio throughout his voting life. Prior to his discharge on May 1, 1981, he had been a FmHA employee for more than thirty years, serving under seven State Directors before becoming one himself in 1979. (tr. 10, 13, 18; affidavit of Brunton, ¶¶ 3, 5, appended to Complaint).

Brunton began with the agency in 1950 as an assistant county supervisor in Waver-ly, Ohio. To qualify for the position, which was a grade level GS–5, he took the civil service examination. In 1952, he was promoted to County Supervisor and reassigned to Cambridge, Ohio, where he remained until 1974. He was again promoted to a grade level GS–12 and reassigned to the FmHA State Office in Columbus. In November 1979, due to the incapacity of the previous State Director, Brunton was designated as Acting FmHA State Director. On April 6, 1980, the USDA Secretary, Bob Bergland, appointed him as the FmHA State Director of Ohio, Grade GS–14. (tr. 9–11; affidavit of Brunton, ¶ 3).

Following the election of President Reagan, the new Administration began taking certain measures designed to reshape the nation's rural development policies and restructure the FmHA in a fashion consistent with the objective of effectuating these policies. Documents submitted by plaintiffs and the testimony of Naylor, Calhoun, and O'Mara explained the various discussions and ultimate decisions within the Administration which led to the dismissal of Brunton and the other plaintiffs. (tr. 74–79, 144–45, 158–64, 210; plaintiffs' Exhibit J).[11]

---

11. A memorandum from the Office of General Counsel to the USDA Office of Personnel Management disclosed the previous problems caused by the reorganizational efforts of a changing administration. The memorandum (plaintiffs' Exhibit J), dated January 16, 1981, provides in relevant part:

This memorandum addresses the alternative approaches available to an incoming administrative (sic) for dealing with the State director positions in the Agriculture Soil Conservation Service (ASCS) and the Farmers Home Administration (FHA). The attempts of the previous administration's (sic) to summarily remove people from these positions have been challenged in the courts.

Two cases have been decided and the decisions conflict with each other. See *Committee for First Amendment Rights v. Bergland*, ... and *DeLong v. United States*, .... A third case, *Awtry et al. v. United States*, ... is pending in the Court of Claims. Additionally, some State directors have filed for a preliminary injunction enjoining their prospective removals or reassignments. We are obtaining that filing.

Because of the uncertainty resulting from these decisions and from the Supreme Court's decision in *Branti v. Finkel* ... any of the options presented in this memorandum are likely to be challenged and it is impossible to predict the result with any certainty. Further, the risks involved are heightened by the possibility that the responsible officials will be named individually. Accordingly, we believe that the potential alternatives for dealing with this situation must be scrutinized carefully by both OPM and the Department of Agriculture.

\* \* \* \* \* \*

*Alternatives*

\* \* \* \* \* \*

4. *Convert the positions to Schedule C through Presidential action.*

The President has the authority to issue an Executive order placing these positions in Schedule C. (citing 5 U.S.C. § 3302). \* \* \* There is some question about how much assistance this placement would be in establishing the policy-making nature of these jobs. Unlike an OPM determination, the President's determination could be based on grounds other than the policy-determining nature of the job. It, however, probably would be of assistance in establishing that political affiliation was required for effective job performance and would help an individual in defending an individual liability claim.

A summary of the course chosen to fill the State Director positions with key persons the Administration could trust to implement its policies is as follows:

On March 23, 1981, the President issued Executive Order 12300, essentially reclassifying the State Director as a Schedule C policy-making position in the excepted service.[12] Shortly thereafter, in the first of two letters dated March 25, 1981, Joseph O'Mara, the Acting Director of the FmHA Personnel Division, informed Brunton that he was being discharged from his position through a reduction-in-force procedure.[13] (tr. 34; plaintiffs' Exhibit U). The second letter, from Dwight Calhoun, the Acting FmHA Administrator, notified Brunton that his authority was being withdrawn and that he would be permanently discharged on May 1, 1981 (tr. 78, plaintiffs' Exhibit U).[14] These letters were sent to all nine-

teen plaintiffs informing them of their discharge (tr. 73).

At the hearing, the government conceded that "the sole motivation for the action taken against the incumbent state directors was their political affiliation with the democratic party" (tr. 84–85). (tr. 151–52). Thus, Brunton and the other plaintiffs filed this suit on April 14, 1981, asking the Court to enjoin the dismissals.

## III. Conclusions of Law

The Court's determination of whether to grant the plaintiffs' preliminary injunctive relief rests upon four standards set forth by the United States Court of Appeals for the Sixth Circuit in *Mason County Medical Association v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977):

*  *  *  *  *  *
*Conclusion*
Because of the complexity of this issue, the lack of clear legal precedent, and the potential for personnel liability, we believe that no one alternative is clearly the most satisfactory.

**12.** *See* Note 7, *supra*.

**13.** While Congress has chosen not to specifically define the term "reduction-in-force," it has authorized the Office of Personnel Management [OPM] (formerly the Civil Service Commission) to prescribe the manner in which federal employees are to be separated or reduced in position or grade incident to a reduction in force:
The [OPM] shall prescribe regulations for the release of competing employees in a reduction in force which give due effect to—
(1) tenure of employment;
(2) military preference, subject to section 3501(a)(3) of this title [i. e. concerning retired military members];
(3) length of service; and
(4) efficiency or performance ratings.
5 U.S.C. § 3502(a). *See* 5 C.F.R. Pt. 351 (1980).
Section 351.204, 5 C.F.R., of the regulations provides that each agency is responsible for applying the specific procedures set out in Part 351 for effecting reductions in force "when the agency determines that a reduction in force is necessary." 5 C.F.R. § 351.201(a) further provides that "[e]ach agency shall follow this Part when it releases a competing employee from his/her competitive level by separation ... when the release is required because of ... reclassification due to change in duties ...."

**14.** The government explained in its post-hearing memorandum, at p. 16, the reason plaintiffs were totally separated from their federal employment:
Almost all of the employees in the FmHA below the rank of State Director are in the competitive serve (sic). As excepted service employees, the plaintiffs were not entitled to displace employees in the competitive service. 5 C.F.R. § 351.705(b)(5). Within the excepted service, an employee has no right to assignment when the agency cannot retain him in his competitive level. Federal Personnel Manual Chapter 351, Subchapter 7–8, Subsection (e). A competitive level consists of positions which are sufficiently alike so that incumbents may be readily changed from one position to another. 5 C.F.R. § 351.403. There were no other positions within FmHA in the same competitive level as the State Director. Plaintiffs' Exhibit U. Therefore, plaintiffs were separated from the federal civil service.
Interestingly enough, Brunton's testimony indicated that the discharge did not come as a complete surprise to him. He generally understood "the state director position to turn-over with a change in national administration" and he candidly admitted that had he been a Republican in 1979, he probably would not have been chosen by the Carter Administration as Acting FmHA State Director (tr. 30, 33). Brunton's successor is the former Republican Lieutenant Governor of Ohio, John W. Brown (tr. 30, affidavit of Brunton, ¶ 18).

1. Whether the [plaintiffs have] shown a strong or substantial likelihood or probability of success on the merits.
2. Whether the [plaintiffs have] shown irreparable injury.
3. Whether the issuance of a preliminary injunction would cause substantial harm to others.
4. Whether the public interest would be served by issuing a preliminary injunction.

For plaintiffs to prevail, they must sustain the burden of persuasion as to all four of these elements. *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).

Viewing the facts of this case in light of these four requirements, we conclude that even if plaintiffs can sustain their burden with regard to the last three, the government has convincingly demonstrated to the Court that there is little likelihood that plaintiffs will ultimately succeed on the merits of this action. Accordingly, the Court determines that plaintiffs' motion is without merit and should be denied. We will address, first, the constitutional question presented by this case, and secondly, the alleged statutory violations.

■ *A. Plaintiffs' Constitutional Claim—Justifiable Political Patronage Dismissals.* As a general proposition, government employers can neither coerce employees to compromise their political beliefs nor place unconstitutional conditions upon their public employment. *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Keyishian v. Board of Regents*, 385 U.S. 589, 605–06, 87 S.Ct. 675, 684–85, 17 L.Ed.2d 629 (1967). However, the employee does not receive blanket First Amendment protection regardless of the governmental interest. A balance must be struck between the employee's First Amendment interest in exercising free political association and speech and the government's interest "in promoting the efficiency of the public service it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).

In *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the Supreme Court applied this First Amendment framework to the political patronage dismissals of four Republican employees (a process server, a bailiff-security guard, the Process Division's chief deputy, and an office employee) of the Cook County, Illinois Sheriff's Office by the newly elected Democratic sheriff. The Court held that the First Amendment proscribed the discharge of these non-civil service employees solely because of their partisan political affiliation or nonaffiliation.

Writing for the plurality, Justice Brennan summarized:

> In short, if conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights.

*Id.* at 363, 96 S.Ct. at 2684 [footnote omitted]. Furthermore, the plurality stated that the patronage dismissals of those governmental officials who hold policymaking, as opposed to non-policymaking, positions may be justified by the vital governmental end in the effective "implementation of policies of the new administration." *Id.* at 367–68, 96 S.Ct. at 2686–87. The majority vote in *Elrod* came in Justice Stewart's concurrence in which his consideration of patronage dismissals was limited to the following:

> The single substantive question involved in this case is whether a nonpolicymaking, nonconfidential government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs. I agree with the plurality that he cannot.

*Id.* at 375, 96 S.Ct. at 2690.

Recently, the Supreme Court in *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), reaffirmed the plurality

opinion in *Elrod* but substantially modified its exception for policymaking employees. In *Branti*, the newly appointed Democratic Rockland County, New York Public Defender threatened to discharge two assistant public defenders solely because they were Republicans. The district court permanently enjoined their termination and both the Second Circuit and Supreme Court affirmed. Writing for the majority, Justice Stevens recast the exception for when an employer could justifiably dismiss employees:

> [P]arty affiliation may be an acceptable requirement for some types of government employment. Thus, if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency.
>
> \* \* \* \* \* \*
>
> In sum, the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

*Id.* at 517–18, 100 S.Ct. at 1294.

The doctrine of *stare decisis* commands this Court to apply this standard set down in *Branti*. We wish to note, however, our agreement with the dissenting Justices as to the standard's ambiguity, breadth, and difficult application. *See Branti v. Finkel, supra* at 522–26, 100 S.Ct. at 1296–98 (Powell, J., Stewart, J., Rehnquist, J., dissenting). Now placed squarely upon the shoulders of the United States District Courts is the burdensome task of judicially overseeing the decisions regarding political dismissals typically made by the top executive officials who are charged with the efficient operation of important government agencies and programs.[15]

■ In the case at hand, the Court feels fortunate in reviewing the role of these plaintiffs as federally appointed employees of such high status. The delicate line-drawing decision that the *Branti* test might impose is absent here. The government has persuasively shown the appropriateness of requiring the FmHA State Directors' affiliation with the incumbent Republican party in order to insure the effective performance of the duties associated with their positions.[16]

Because of the unique decentralized structure of the FmHA, each State Director is a vital cog in the machinery of a new Administration's formulation and implementation of national farm and rural development policies. More than any other person in the agency, the State Director is in the critical position of insuring either the success or failure of these national policies through the administration of FmHA programs within his state area. It is certainly to be expected that these positions would be filled by individuals who will openly sup-

---

15. The Court's vague, overbroad decision may cast serious doubt on the propriety of dismissing ... thousands of other policymaking employees at all levels of government, because of their membership in a national political party.

A constitutional standard that is both uncertain in its application and impervious to legislative change will now control selection and removal of key governmental personnel. Federal judges will now be the final arbiters as to who federal, state, and local governments may employ. In my view, the Court is not justified in removing decisions so essential to responsible and efficient governance from the discretion of legislative and executive officials. [Footnote omitted.]

*Id.* at 525–26, 100 S.Ct. at 1298–99.

16. Both parties in this action have cited the Court to some other federal court decisions involving the identical issue of FmHA State Director political patronage dismissals. *See Delong v. United States*, Civil Action No. 78–294–A (E.D.Va.1978), *rev'd and remanded on other grounds*, 621 F.2d 618 (4th Cir. 1980), *opinion on remand*, September 18, 1980, appeal pending; *Committee For Protection of First Amendment Rights v. Bergland*, 434 F.Supp. 314 (D.D.C.1977), *aff'd* 626 F.2d 875 (D.C.Cir. 1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3012, 65 L.Ed.2d 1113 (1980). Although these decisions are helpful, they are not controlling or dispositive of the conclusions this Court makes based on findings of facts before it.

port and aggressively implement the policies of the in-party in the discharge of their duties.

The new Administration under President Reagan expects the policymaking role of FmHA State Directors to be even more important in the future than it has been in the past. The President's Executive Order 12300, the civil service's "confidential or policy-determining" classification, and the USDA's published job description of the position all emphasize the increasing role of State Directors in this regard. Equally important is the fact that the actual duties and real nature of the position have been in many respects tantamount to its present official status and description. Mr. Naylor and plaintiff Brunton gave numerous examples of how State Directors may engage in what *Elrod* and *Branti* legally designated as "policy-formulation" functions. They are extremely influential sources of input, bridging the objectives of the Administration with the needs of the state and local interests.

In the implementation of huge federal assistance programs for an entire state, the State Directors enjoy considerable authority with minimal supervision. Naturally, acting as the Administration's representatives, the State Directors develop, plan, coordinate, revise, and monitor the progress of the agency's programs and thus gauge the success of the Administration's national policies. Without their political sympathy and loyal cooperation, the FmHA Administrator and those officials higher in the chain of command might face a situation where the hostile efforts or foot-dragging actions of any one of the forty-six State Directors could singlehandedly thwart the Administration's goals in that particular state. In sum, an important fact of modern governmental life is that "if government is to work, policy implementation is just as important as policymaking. No matter how wise the chief, he has to have the right Indians to transform his ideas into action, to get the job done." *Branti v. Finkel, supra,* 445 U.S. at 530, 100 S.Ct. at 1301 (Powell, J., dissenting); *Loughney v. Hickey,* 635 F.2d 1063, 1066 (3d Cir. 1980) (Aldi-

sert, J., concurring). And, appointments based on political affiliation are necessary in some instances such as this to guarantee that "representative government not be undercut by tactics obstructing the implementation of policies of the new administration ...." *Elrod v. Burns, supra,* 427 U.S. at 367, 96 S.Ct. at 2686.

The plaintiffs are adamant in arguing that these duties and powers can be exercised by sufficiently qualified persons irrespective of their political affiliation. (Plaintiffs' Post-Hearing Brief, at 7 and 14). Framing the issue in this light, however, converts the standard in *Branti* into an impossible hurdle for any executive official in constitutionally justifying a political patronage dismissal. As the standard implies and as the dissent in *Branti* emphatically states, political patronage practices still serve vital governmental interests. *See Branti v. Finkel, supra,* 445 U.S. at 527–34, 100 S.Ct. at 1299–1303 (Powell, J., dissenting).

In this country's political democracy, our elected leaders come to office with new domestic and foreign policies, upon which they have vigorously campaigned. They necessarily appoint and depend upon those key individuals who ideologically and politically share their views and objectives in order to carry out these policies the electorate has sanctioned. There is a vital need for government efficiency and the President and key officials in his Administration must have the right to consider political affiliation when they select other high-ranking officials whose political loyalty will be more than tenuously related to the efficacy of their office. The issue is not whether plaintiffs are equally qualified to perform the tasks, but whether, in the eyes of the Administration, they will aggressively lend themselves to the achievement of the national policy objectives. The Court refuses to constitutionally compel the FmHA Administrator and other key officials in the USDA to enter into a close relationship, where mutual confidence and special trust is of the essence, with individuals not of their own choosing. Accordingly, we con-

clude that there is but a minimal chance of plaintiffs succeeding on the merits of their constitutional claim.

B. *Plaintiffs' Statutory Claim.* Twelve of the nineteen plaintiffs are preference eligible veterans, as defined by 5 U.S.C. § 2108, who additionally challenge their dismissals under the Veterans Preference Act of 1944.[17] The Veterans Preference Act reflects Congress' desire to encourage and reward military service by granting preferences to veterans in certain aspects of public employment. *See Johnson v. Robinson,* 415 U.S. 361, 381–82, 94 S.Ct. 1160, 1172–73, 39 L.Ed.2d 389 (1974). For example, veterans are accorded special point and service credit preferences in civil service entrance and other examinations, 5 U.S.C. § 3311; and the age and physical requirements are waived, wherever possible, for veterans seeking government appointments and promotions, 5 U.S.C. §§ 3312, 3363.

The Act additionally provides a preference in the retention of federal employees. Preference eligible veterans are afforded special procedural and substantive safeguards in removal and other adverse action proceedings. Section 7512(a) of Title 5, U.S.C., provides that "[a]n agency may take adverse action against a preference eligible employee . . . only for such cause as will promote the efficiency of the service." *See also,* the regulations promulgated under the Act, 5 C.F.R. Pt. 752 (1980). The plaintiffs claim, through Count III of their complaint, that "[the] personnel actions complained of violated . . . 5 U.S.C. § 7512, because patronage is not 'cause' for removal of a veteran from the position of FmHA State Director within the meaning of the Act."

■ The issue confronting this Court, therefore, is whether the dismissal of plaintiffs through a reduction-in-force procedure constituted an "adverse action" within the meaning of 5 U.S.C. § 7512 and 5 C.F.R. Pt. 752, and, if so, whether the dismissals were proper and warranted as being "for such

cause as will promote the efficiency of the service." We wish to point out, in the language of Chief Judge Cowen of the United States Court of Claims, that the Veterans Preference Act does not "render limitless . . . rights and benefits . . . [n]or does [it] . . . cloak veterans with any 'penumbral rights;' its provisions are necessarily specific, and for plaintiffs to benefit therefrom they must show themselves to be clearly within the intended ambit of those provisions." *Crowley v. United States,* 527 F.2d 1176, 1182–83 (Ct.Cl.1975). The plaintiffs here have failed to show how the Act is applicable to the facts of the instant case.

Following the issuance of Executive Order 12300 (March 23, 1981), the decision was made in the personnel divisions of the USDA to separate plaintiffs from their federal employment by reduction-in-force [RIF] procedures.[18] RIF actions are not treated as "adverse actions" within the meaning of the Act. "Adverse actions" are defined as "a removal, suspension for more than 30 days, furlough without pay, or reduction in rank or pay." 5 U.S.C. § 7511(2). The regulations specifically exclude RIF actions. 5 C.F.R. § 7512 (1980).

The plaintiffs strongly argue, however, that the RIF separation procedures employed by the FmHA were a pretext to conceal the improper agency motivation of dismissing plaintiffs for political patronage reasons:

> The Government's use of a series of complex devices to discharge Plaintiffs and replace them with patronage appointees must be viewed in light of actions taken by prior Administrations to achieve the same goal. Were it not for that history . . . and the existence of strong judicial precedent casting doubt on the validity of the practices as to this very position, . . . the circuitous route taken by the new Administration to oust Plaintiffs would not have been necessary. (Plaintiffs' Post-Hearing Brief, at 24–25).[19]

---

17. Act of June 27, 1944, ch. 287, 58 Stat. 387, codified in scattered sections of Title 5, United States Code.

18. *See* note 13, *supra.*

19. *See* note 11, *supra.*

The standard for this Court in reviewing the discharge of a federal employee has been stated by the Sixth Circuit in *Sexton v. Kennedy*, 523 F.2d 1311, 1314 (6th Cir. 1975):

> The judicial function is to determine whether there has been substantial compliance with the applicable procedures and statutes, and not to review the administrative determination as to the wisdom or good judgment of the agency in exercising discretion. [Citations omitted].

The plaintiffs do not claim that the FmHA failed to comply with the applicable RIF procedures, found in 5 C.F.R. Pt. 351, in effecting the dismissals. Instead, they challenge the underlying purpose for which the RIF procedures were employed. There is no question that were this Court to find the patronage practices unconstitutional, the dismissals through any agency procedures would not be for just "cause" within the meaning of the Veterans Preference Act. *Arnett v. Kennedy*, 416 U.S. 134, 162, 94 S.Ct. 1633, 1648, 40 L.Ed.2d 15 (1974); *Sexton v. Kennedy, supra* at 1315. This, however, is not the case. Furthermore,

> [W]ere we to look no further than the *stated* reason for an employee's separation, not only could an agency cavalierly discharge preference eligibles under the guise of a "reduction-in-force" but under that type of action it could also deprive them of all adverse action procedural rights to which preference eligibles are entitled .... [emphasis in original].

*Fitzgerald v. Hampton*, 467 F.2d 755, 758–59 (D.C.Cir.1972).

The Court finds nothing sinister in the method chosen by the FmHA to separate plaintiffs from their appointed positions. Two of the permissible reasons justifying a RIF separation, set out at 5 C.F.R. § 351.-201(a), are an agency's "reorganization" [20] and an employee's "reclassification due to change in duties." The evidence here convincingly supports the FmHA's employing the RIF procedures based upon both of these reasons. It is self-evident that any reorganization involving the change of Administration cannot be accomplished without readjustments which may prove unpalatable to some of the affected personnel.

Accordingly, the Court determines that plaintiffs have failed to demonstrate a substantial likelihood of their succeeding on the merits of their statutory claim.

*C. Conclusions.* The Court has jurisdiction of this action under 28 U.S.C. §§ 1331(a) and 1346.

In accordance with the accompanying Findings of Fact and Conclusions of Law, it is hereby determined that plaintiffs' motion for a preliminary injunction be DENIED.

Furthermore, pursuant to the Court's earlier discussion, it is determined that the defendant's motion to dismiss or, in the alternative, for summary judgment, should be and the same hereby is DENIED.

IT IS SO ORDERED.

---

**20.** 5 C.F.R. § 351.203(g) (1980) defines "reorganization" as "the planned elimination, addition, or redistribution of functions or duties in an organization."