Arnaldo JIMENEZ FUENTES, et al.,
Plaintiffs, Appellees,

v.

Honorable Jaime TORRES GAZTAM-
BIDE, et al., Defendants, Appellants.

No. 85–1655.

United States Court of Appeals,
First Circuit.

Sept. 19, 1986.

As Amended Sept. 24, 1986.

Bailey Aldrich, Senior Circuit Judge, filed concurring opinion.

Torruella, Circuit Judge, filed dissenting opinion.

Marcos Ramirez-Irizarry with whom Hector Rivera Cruz, Secretary of Justice, Ramirez & Ramirez, and Marcos A. Ramirez-Lavandero, Hato Rey, P.R., were on brief for defendants, appellants.

Frank Rodriguez-Garcia, Ponce, P.R., for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, ALDRICH, COFFIN, BOWNES, BREYER and TORRUELLA, Circuit Judges.

OPINION EN BANC

COFFIN, Circuit Judge.

Plaintiffs-appellees, Arnaldo Jimenez Fuentes and Jose Vicente Vazquez, claim that they were transferred from their government positions for political reasons in violation of the first and fourteenth amendments. After a lengthy hearing, the United States District Court for the District of Puerto Rico issued a preliminary injunction, ordering their reinstatement. A panel of this court denied a stay, granted an expedited appeal, and affirmed the order of the district court. After the panel denied rehearing, this court vacated the panel's opinion, setting the case for rehearing *en banc*. In light of full briefing and oral argument, and a review of the district court hearing and the relevant case law, we reverse the issuance of a preliminary injunction.[1]

I

Plaintiffs Jimenez Fuentes and Vicente Vazquez are members and active participants of the Partido Nuevo Progresista (PNP), the ruling party in Puerto Rico from 1977 to 1985. They were two of the eleven Regional Directors of the Puerto Rico Urban Development and Housing Corporation (CRUV—Corporacion de Renovacion Urba-

---

1. In a companion case, *DeChoudens v. Government Development Bank of Puerto Rico*, 801 F.2d 5 (1st Cir.1986), we affirm a district court's issuance of a preliminary injunction reinstating the Vice President of the Finance Area in the Government Development Bank.

na y Vivienda). CRUV is a public corporation, 17 L.P.R.A. §§ 21–25 (1984), attached to the Department of Housing of the Commonwealth of Puerto Rico, 3 L.P.R.A. § 441e (1982). As Regional Directors, plaintiffs worked in the Program of Public Housing, the principal division of CRUV.

In November 1984, the Partido Popular Democratico (PPD) defeated the PNP in the gubernatorial election, and assumed power in January 1985. Defendants-appellants, Jaime Torres Gaztambide (Secretary of the Department of Housing of Puerto Rico) and Quevedo del Rio (Executive Director of CRUV), both PPD members, were appointed within two months. In March 1985, they transferred plaintiffs from the positions of Regional Director to the plaintiffs' previously-held positions at CRUV.

## II.

At the outset we note the burden plaintiffs faced in order to gain a preliminary injunction:

> "In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) *that plaintiff has exhibited a likelihood of success on the merits;* and (4) that the public interest will not be adversely affected by the granting of the injunction."

*Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981) (quoting *Women's Community Health Center, Inc. v. Cohen,* 477 F.Supp. 542, 544 (D.Me.1979) (citations omitted)) (emphasis added).

For purposes of appellate review, the issue is whether "the issuance of the injunction, in light of the applicable standard, constituted an abuse of discretion." *National Tank Truck Carriers, Inc. v. Burke,* 608 F.2d 819, 823 (1st Cir.1979) (quoting *Doran v. Salem Inn, Inc.,* 422 U.S. 922 (1975)). The constitutionality of

the demotions was not before the district court and is not presently before us because there has been no trial on the merits. "The only question properly before the Court is whether or not a preliminary injunction should have been issued to" reinstate plaintiffs to their positions as Regional Directors. *See Thornburgh v. American College of Obstetricians and Gynecologists,* —— U.S. ——, ——, 106 S.Ct. 2169, 2207, 90 L.Ed.2d 779 (1986) (O'Connor, J., dissenting). We emphasize that because we hear this matter on appeal from a grant of a preliminary injunction, our "conclusions" and "holdings" as to the merits of the issue presented are to be understood as statements as to probable outcomes. *Planned Parenthood,* 641 F.2d at 1009. "We eliminate repeated reference to this fact at each relevant juncture of this lengthy opinion for purposes of brevity and simplicity." *Id.*

## III.

Defendants claim that the district court abused its discretion in finding that the plaintiffs had shown a likelihood of success on the merits. To support this argument, they challenge three independent findings by the district court: one, that plaintiffs were transferred for political reasons; two, that the positions of Regional Directors were not positions for which political affiliation was appropriate; and three, that plaintiffs would not have been transferred but for their political affiliation. Defendants correctly point out that if any of the findings were an abuse of discretion, we must reverse the issuance of the preliminary injunction.

## A.

■ We cannot say that the district court abused its discretion in finding that the plaintiffs were transferred for political reasons. *See Rosaly v. Ignacio,* 593 F.2d 145, 149 (1st Cir.1979) (whether protected conduct was a substantial or motivating factor in decision to discharge plaintiff). The court found that the proximity in time between the defendants' appointment and

the plaintiffs' transfer indicated an underlying political motive, especially in light of the unrefuted evidence that plaintiffs were active PNP members.[2]  Although defendant Quevedo del Rio testified that he did not know the plaintiffs' political affiliation when he dismissed them, the district court did not believe this statement, in part because of Quevedo's admission that a Regional Director, to be effective, must be a member of the PPD.  In response to the defendants' assertion that plaintiffs were transferred because of their incompetency, the district court found that at no time prior to their removal were plaintiffs ever apprised of any such allegation.  Additionally, plaintiffs had never been admonished or disciplined for their work.  Whether or not we would have reached the same conclusion as to this issue, we cannot say that the district court abused its discretion.

### B.

We now address the dispositive issue— whether political affiliation is an appropriate requirement for the position of CRUV Regional Director.

### 1. *Survey of the Authorities*

In *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the Supreme Court held that public employees who alleged they were discharged because of their political affiliation stated a claim for violation of their first and fourteenth amendment rights.[3]  Writing for a plurality, Justice Brennan determined that a dismissal based on an employee's failure to support a political party clearly infringes First Amendment freedoms of belief and association.  *Elrod,* 427 U.S. at 359–60, 96 S.Ct. at 2682–83.  The conditioning of pub-

lic employment on political affiliation could survive constitutional challenge only if it furthered a vital governmental interest[4] by a means least restrictive of first amendment freedoms.  *Id.* at 362–63, 96 S.Ct. at 2684.  The plurality found that a valid interest was to ensure that "representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate."  *Id.* at 367.  But a patronage system involving the wholesale dismissal of public employees for partisan reasons, applied without regard to an employee's responsibilities, was not the least restrictive means of serving that interest.  The plurality thus concluded that "[l]imiting patronage dismissals to policymaking positions is sufficient to achieve this governmental end."  *Id.* at 367, 96 S.Ct. at 2687.

Apart from noting that it is not always easy to determine when a particular position is policymaking, *id.* at 367, 96 S.Ct. at 2686, the plurality opinion provides little guidance for lower courts because it did not apply the new legal standard to the particular positions in question.  It did, however, suggest that employees who act as advisers, who formulate plans for implementing broad goals, or whose responsibilities are either not well-defined or of broad scope are more likely to function as policymakers.  427 U.S. at 367–68, 96 S.Ct. at 2686–87.

Justice Stewart's concurring opinion in *Elrod,* necessary for the 5–3 decision,[5] narrowed the scope of the plurality's protection formulation.  His opinion concludes that confidential, as well as policymaking, employees can be discharged because of

---

**2.**  Jimenez Fuentes served as the political auditor for the PNP mayor of Juncos, assisting the mayor generally in his campaign.  Vicente Vazquez was the PNP Coordinator of the Electoral Unit and Secretary of the Association of Pro-Statehood Engineers, as well as the campaign director for a Commonwealth Senator, Chito Ojeda.

**3.**  Plaintiffs in *Elrod* were employees of the Cook County Sheriff's Office, including the chief dep-

uty of the process division, the bailiff, and a process server.

**4.**  The plurality cautioned that "care must be taken not to confuse the interests of partisan organizations with governmental interests," 427 U.S. at 362, 96 S.Ct. at 2684, to which it added, "[o]nly the latter will suffice," *id.*

**5.**  The concurring opinion was joined by Justice Blackmun.

their political beliefs. *See id.* at 375, 96 S.Ct. at 26900.

Subsequently, in *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Court, with Justice Stevens writing for a majority, departed from the policymaking and confidential labels espoused in *Elrod.* It first recognized that the labels were underinclusive, because "a position may be appropriately considered political even though it is neither confidential nor policymaking in character." *Id.* at 518, 100 S.Ct. at 1294.[6] More importantly, the Court found that the labels were overinclusive, because party affiliation is not a relevant consideration for all policymaking or confidential positions. *Id.* The Court distinguished between policymaking positions related to "partisan political interests [or concerns]," *id.* at 519, 100 S.Ct. at 1295, which would be vulnerable to discharge, and positions having no bearing on such concerns, which would be protected by the First Amendment.[7] As an example of the latter, the Court discussed the position of a state university football coach, which is policymaking, but for which it cannot seriously be argued that "Republicans make better coaches than Democrats ... no mat-

ter which party" controls state government. *Id.* at 518, 100 S.Ct. at 1294.

*Branti* thus frames the "ultimate question" as "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1295. That an employee is in a policy-making or confidential position[8] remains relevant to the ultimate inquiry, but it is no longer dispositive. *See Meeks v. Grimes,* 779 F.2d 417, 420 (7th Cir.1985). After making these observations, the Court applied the new legal standard to the position in question. It determined that the functions of an assistant public defender, though policymaking, related to "the needs of individual clients and not to any partisan political interests." 445 U.S. at 519, 100 S.Ct. at 1295. Likewise, although public defenders shared confidential information arising out of their various attorney-client relationships, the Court found that such confidentiality did not have any bearing on "partisan political concerns." *Id.*

To the skeletal teachings of *Elrod* and *Branti* have been added a considerable body of case law from circuit courts of appeal and district courts. This seems a

---

**6.** As an example, Justice Stevens described the position of an election judge, where state election laws require that precincts be supervised by two judges of different parties. *Id.*

**7.** Although *Branti's* requirement that a position relate to "partisan" concerns at first seems at odds with the use of that term in *Elrod,* the two are consistent. The plurality opinion in *Elrod* states that political firing can only be justified by governmental interests, not the interests of partisan *organizations.* The Court in *Branti* reaffirms that conclusion, but, in finding *Elrod's* policymaking and confidential labels overinclusive, determined that the positions must relate to "partisan political concerns." Thus, *Elrod* and *Branti* hold that political firing is constitutional when it serves the interests of the government, not a party organization; it serves a governmental interest when used for policymakers or confidential employees whose work involves issues where there is room for political disagreement on goals or their implementation.

**8.** In addition to policymaking and confidential positions, the *Branti* Court added the position of a spokesperson:

"[T]he Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments." 445 U.S. at 518, 100 S.Ct. at 1295.

Consistent with this statement, the Third Circuit in *Brown v. Trench,* 787 F.2d 167 (3d Cir.1986), analyzed the propriety of firing, for political reasons, an employee responsible for writing press releases, speeches, communicating with legislators, and presenting the views of the county commissioners to the press and public on a daily basis. Although some of the employee's duties were clerical, and her writings were based on information from other departments and were never released until reviewed both by her supervisor and the Commissioners, the court found political affiliation to be appropriate because of the employee's role as a spokesperson. 787 F.2d at 170.

helpful corpus because of the variety of governmental positions considered, the additional inquiries made (consistent with the objective charted by the Court), and the overall coherence and consistency of these lower court decisions. We accordingly report our survey of this body of law.

The courts have found employees in the following positions to be subject to removal based on their political affiliation: Assistant Director of Public Information for county, *see Brown v. Trench*, 787 F.2d 167 (3d Cir.1986); First Deputy Commissioner of the Department of Water, *see Tomczak v. City of Chicago*, 765 F.2d 633 (7th Cir. 1985); Superintendent of Employment for Chicago Park District, *see Shakman v. Democratic Organization of Cook County*, 722 F.2d 1307 (7th Cir.1983); assistant district attorney, *see Livas v. Petka*, 711 F.2d 798 (7th Cir.1983); *Mummau v. Ranck*, 687 F.2d 9 (3d Cir.1982) (per curiam); fee agent, *see Sweeney v. Bond*, 669 F.2d 542 (8th Cir.1982); city solicitor and assistant solicitor, *see Ness v. Marshall*, 660 F.2d 517 (3d Cir.1981); Senior Citizens' Coordinator, *see Nekolny v. Painter*, 653 F.2d 1164 (7th Cir.1981); Deputy Parks Commissioner, *see Ecker v. Cohalan*, 542 F.Supp. 896 (E.D.N.Y.1982); state director of the Farmers Home Administration, *see Committee to Protect the First Amendment Rights of Employees of the Department of Agriculture v. Bergland*, 626 F.2d 875 (D.C.Cir.1979) (pre-*Branti* ); *Brunton v. United States*, 518 F.Supp. 223 (S.D.Ohio 1981).

Employees in the following positions were found not subject to dismissal under *Elrod* and *Branti:* city court bailiffs, *see Meeks v. Grimes*, 779 F.2d 417 (7th Cir. 1985) (remanding for further findings); road-graders, *see Horton v. Taylor*, 767 F.2d 471 (8th Cir.1985); bookkeeper, *see Grossart v. Dinaso*, 758 F.2d 1221 (7th Cir.1985); deputy court clerks, *see Barnes v. Bosley*, 745 F.2d 501 (8th Cir.1984); deputy sheriff, *see Jones v. Dodson*, 727 F.2d 1329 (4th Cir.1984); *Barrett v. Thomas*, 649 F.2d 1193 (5th Cir.1981); supervisor of county branch of the Auditor's office, *see DeLaCruz v. Pruitt*, 590 F.Supp. 1296 (N.D.Ind.1984); city clerk, *see Visser v. Magnarelli*, 530 F.Supp. 1165 (N.D.N.Y. 1982).

## 2. *The Guidelines of Analysis*

From this review of the case law we draw the following propositions. The fundamental one, supporting the limited exemption from First Amendment protection against politically-motivated discharge, is that representative government needs a certain amount of leeway for partisan selection of agents in order to work. These agents may be policymakers, confidential employees, or others for whom party affiliation is an equally "appropriate" requirement. Appropriateness is, we think, a corollary to our system of determining the direction of governmental entities by the popular election of top office holders who have taken or are considered to have taken positions on one or more issues during a campaign. In order for the new administration to be given an opportunity to fulfill expectations, it must have available and also appear to have available significant facilitators of policy, people who have the personal and partisan loyalty, initiative, and enthusiasm that can make the difference between the acclaimed success of a government agency or program and its failure or, more typically, its lackluster performance. The presence of such persons advances the goals of representative government; their absence, in *Elrod's* term, "undercut[s]" such government. 427 U.S. at 367, 96 S.Ct. at 2687.

Identifying generic categories of positions where partisan selection and rejection are permissible has, as we have seen, proven to be an elusive and intractable task. But as courts have addressed the task, they have shed light on useful approaches. A threshold inquiry, which derives from *Branti*, involves examining whether the position at issue, no matter how policy-influencing or confidential it may be, relates to "partisan political interests.... [or] concerns." 445 U.S. at 519, 100 S.Ct. at 1295. That is, does the position involve government decisionmaking on issues where there

is room for political disagreement on goals or their implementation? Otherwise stated, do party goals or programs affect the direction, pace, or quality of governance?

If this first inquiry is satisfied, the next step is to examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement. We would note that in conducting this inquiry, courts focus on the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office. *Tomczak*, 765 F.2d at 640; *Ness*, 660 F.2d at 522; *Alfaro de Quevedo v. De Jesus Schuck*, 556 F.2d 591, 593 n. 4 (1st Cir. 1977). "The relevant inquiry is to the function of the public office in question and not the actual past duties of the particular employee involved." *Brown*, 787 F.2d at 168. "Thus, if an officeholder performs fewer or less important functions than usually attend his position, he may still be exempt from the prohibition against political terminations if his position inherently encompasses tasks that make his political affiliation an appropriate requirement for effective performance." *Tomczak*, 765 F.2d at 641.

With this perspective in mind, a court's function, it seems to us, is to do what courts are often called upon to do—to weigh all relevant factors and make a common sense judgment in light of the fundamental purpose to be served. The analogies that come to mind are the following determinations: whether an employee is a supervisor and therefore not a proper member of a bargaining unit, *see Fall River Savings Bank v. NLRB*, 649 F.2d 50 (1st Cir.1981); whether an individual is an independent contractor or an agent, *see Penthouse International, Ltd. v. Barnes*, 792 F.2d 943 (9th Cir.1986); and whether, in a suit under the Federal Torts Claims Act, an official performs discretionary or ministerial duties, *see Ricci v. Key Bancshares of Maine, Inc.*, 768 F.2d 456 (1st Cir.1985). In determining whether a particular position is policymaking, we are guided by Judge Weinstein's catalogue of relevant factors:

"Whether any particular non-elective position in government serves this function of responding relatively directly to the voters requires some practical sense for the political-governmental system in operation. Among the indicia that locate a job along the spectrum between policymaker and clerk are: relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials and responsiveness to partisan politics and political leaders."

*Ecker v. Cohalan*, 542 F.Supp. 896, 901 (E.D.N.Y.1982). To this we would add the factor of "responsibilities that are not well defined or are of broad scope." 427 U.S. at 368, 96 S.Ct. at 2687.

### 3. Analysis of the Position of Regional Director of CRUV

■ Our first inquiry, then, is whether the position relates to partisan political interests or concerns. At this stage of the proceedings, we conclude that it does. The Regional Director is an employee of CRUV, one of several divisions that carry out the policies of the Department of Housing. CRUV's objective is to improve the living conditions of low and middle income families in urban areas. Among other goals, it attempts to reduce inadequate housing, meet the demand for new housing, encourage private industry's participation in the provision of housing, improve urban communities that lack adequate facilities, and promote the community's participation in the housing area. Its customers include almost 300,000 families. There are several areas within CRUV, the principal division being the Program of Public Housing, which employs 3,300 persons in eleven regional offices throughout Puerto Rico, approximately 90% of all CRUV employees.

Although CRUV's objective is to assist in the provision of housing to *all* low and middle income urban residents regardless of political persuasion, the subject-matter

of the division's work is still of a political nature in the context of the Court's opinion in *Branti*. We think this point is well-illustrated by *Tomczak v. City of Chicago*, 765 F.2d 633 (7th Cir.1985), where the Seventh Circuit reversed the district court's judgment that the plaintiff, the First Deputy Commissioner of the Department of Water, was protected from partisan termination. The district court had found that the plaintiff's "only area of decisionmaking authority, while broad within that area, related solely to the mundane decisions concerning the repair and rehabilitation of [Chicago's] water systems." *Id.* at 641. Finding that the goal of the Water Department was to provide service to all residents without regard to politics, the district court concluded that political affiliation was not an appropriate requirement for the position of First Deputy Commissioner. *Id.*

The Seventh Circuit disagreed, characterizing the district court's analysis as "an unduly myopic view of the role of politics in the seemingly apolitical context of universal provision of services." *Id.* The court stated that the "primary function of any local governmental entity is the provision of services" and that "[e]lections often turn on the success or failure of the incumbent to provide these services." *Id.* Even though plaintiff's position concerned the provision of water to *all* citizens, the court found that his responsibility in that position made political affiliation an appropriate requirement.

Similarly, the provision of housing to low and middle income city residents is a vital political issue, at least as important to partisan program goals as the provision of water discussed in *Tomczak*.[9] A specific illustration of the link between public housing and political philosophies was provided at the hearing by defendants' expert witness, Dr. Jack Hirsbrunner, who conducted a study of the CRUV and concluded that political affiliation was an appropriate criterion for the position of Regional Director. He testified that the ideological differences between the PNP, which favors statehood for Puerto Rico, and the PPD, which favors autonomy, give rise to conflicting approaches to the programs and functions of CRUV. An ideological conflict, he believed, would hinder an administration's program. For example, one party favors the government taking an active role in administering properties while the other prefers that private industry assume these functions; additionally, he stated that one party desires the utilization of federal funds, while the other supports the use of local funds.

We therefore hold that, at this juncture at least, the position satisfies the first inquiry.

Our second inquiry involves the inherent powers and privileges of the position of Regional Director. There are eleven Regional directors in all of Puerto Rico, serving under an Executive Director and an Associate Director. Under them serve some 3000 of the 3600 CRUV employees. The position's job description, as to which there was no disagreement at the hearing, contains twenty distinct duties. We deem the job description sufficiently important to include it as an Appendix to this opinion.

For purposes of analysis we have classified the duties into five groups, only one of which, the last, is neutral on the question of whether the position of Regional Di-

---

**9.** We are aware that the Puerto Rico Supreme Court, in *Colon v. CRUV*, 84 J.T.S. 52 (P.R.1984), decided that the position of District Manager (similar to Regional Director) at CRUV was not one for which political affiliation was an appropriate requirement. It seems to have based its decision on the fact that the provision of housing was an apolitical task. The Court stated that it did not believe the efficient discharge of the duties of a Regional Director of a public housing program required a "given loyalty to the ideological axioms of a political party.

Such a preference is not necessarily a valid criteria [sic] for being either the person entrusted with implementing that social program's policies, or the recipient of such benefits." *Id.* at 19.

We respectfully disagree. We do not frame the inquiry in terms of whether a position requires loyalty with a party's "ideological axioms," but instead, whether the position related to partisan political interests and concerns. As we explain in this section of the opinion, we find the threshold inquiry satisfied in this case.

rector more closely resembles a policymaking/confidential official than a clerk. The other four clearly show that the Regional Director proposes, establishes, and implements public policy, is privy to confidential information, and acts as a spokesperson for the agency. What follows, then, is the list of job duties, organized by us into categories, with the original number of each duty retained.

### 1. Policy-making Functions

1. Directs, plans, and supervises operational activities of the Region.

3. Monitors compliance with Commonwealth and federal regulations.

14. Discusses the Regional's operational problems with the Associate Director.

15. Recommends improvement in program to Executive Director.

19. Prepares and controls the Region's budget.

20. Performs any assigned task.

### 2. Representative Functions

4. Conducts periodic meetings on regulations, work guidelines, etc. with supervisory personnel.

6. Attends meetings, as agency representative, with other government officers and civic leaders to coordinate government services offered to public-housing residents.

12. Meets with residents and general public to resolve problem cases.

16. Meets with residents and organized groups to coordinate social activities.

### 3. Spokesperson Functions

8. Drafts correspondence for the Executive Director and Associate Director.

### 4. Personnel Duties

9. Supervises and evaluates Region's section supervisors.

10. Recommends recruitment, dismissals, promotions, salary increases, and other matters for Region's employees.

11. Recruits "necessary irregular personnel."

17. Organizes training of Region's employees.

### 5. Ministerial Duties

2. Reviews and signs reports to central office, HUD, and other agencies.

5. Reviews and signs reports on rent changes, purchase orders, disbursements, and budgets sent to other agencies.

7. Drafts reports on work performed.

13. Visits the Region's housing projects.

18. Receives telephone calls involving Region's operations.

In addition, plaintiff Jimenez Fuentes' own testimony at the hearing suggests his role as a policymaker:

"As regional directors we deal—we have the responsibility of dealing with the debts at the public housing project. When I arrived in Caguas to direct the region, the problem of the debt was a very serious and extremely serious problem ... I was sent to Caguas because ... they had to send to Caguas someone who knew the region and who could do the work of a regional director.... Since I had knowledge of the problems of the debt in Caguas we immediately took corrective steps to fix the situation in Caguas." [10]

Likewise, plaintiff Vicente Vazquez testified that when he began as Regional Di-

---

**10.** Jimenez Fuentes also testified that:
"The problem of the debt is not something that can be analyzed merely through a report regarding the debt. It's a much more complicated problem. And you have to see what are the attitudes and the jobs performed by the administrators who are the ones who deal directly with the problem of the debt.... You have to analyze personnel, the attitude of the personnel, the money available in the budget for the maintenance. That is, there are specifically three areas which are very important, they are the rent collection, maintenance, and community work.... If you don't work effectively with them, the attitude of personnel, the number of administrators you have, the budget, all those details.... We were able to organize a working team which greatly decreased the debt in that project."

rector, he was told that he "had to be tough and aggressive in order to straighten out this region." He stated that it had been "a challenge ... to take control of the San Juan One Region and to lead it to be one of the best ones."

That the Regional Directors do not have final decision-making authority is not determinative of our inquiry. *Nekolny,* 653 F.2d at 1170. They are not like the successful plaintiff in *Barrett v. Thomas,* 649 F.2d 1193 (5th Cir.1981), only one of several hundred deputies to a policymaking official. Rather, they are sole directors of an entire region, each supervising approximately three hundred employees. The Regional Director is, in effect, the alter ego of the Executive Director at the regional level. It is through the relationship with the Regional Directors that the Executive Director maintains effective control of the implementation of the housing programs.

Other courts that have analyzed the nature of the responsibilities of state directors of an agency or program have also found that such employees perform sufficiently important roles in government to make political affiliation an appropriate requirement. The District of Columbia Circuit, in a pre-*Branti* opinion, determined that state directors of the Farmers Home Administration exercised considerable control over the implementation of agricultural program policies at the state and local level such that they could be discharged for political reasons. *Committee to Protect the First Amendment Rights of Employees of the Department of Agriculture v. Bergland,* 626 F.2d 875 (D.C.Cir.1979). The court found that even though the United States Civil Service Commission classified these positions as not confidential or policymaking positions, holders of those positions could insure the success or failure of the program. *Id.* at 879. As the court stated:

"[P]ersons administering huge Federal government programs for an entire state will have a high policy component to their activities, both because such large scale exercise of power usually implicates substantive internal policy, and because such positions are a natural source

for influential recommendations of changes in policy. Each state director supervises a staff of nearly 100 statewide and acts as 'the administration's pipeline and advocate at the state and the local level.'" *Id.*

In *Tomczak v. City of Chicago,* 765 F.2d 633 (7th Cir.1985), the plaintiff argued that he was not a policymaker because he performed purely ministerial functions. The Seventh Circuit rejected that assertion, finding that he occupied the second highest job in a large city department, including the administration of a bureau with 1,150 employees and a large annual budget. *Id.* at 641–42. The court concluded that plaintiff was in a position where "his political affiliation could affect the ability of a new administration to implement new policies." *Id.* at 642. Relevant to our case, the court found that, "even though ultimate decision-making authority in most areas rested with the Commissioner [and not the plaintiff], plaintiff had substantial input into those decisions" and his "duties were not strictly circumscribed and ... required something substantially more than simple ministerial competence." *Id.* (citation omitted).

Likewise, in *Brunton v. United States,* 518 F.Supp. 223 (S.D.Ohio 1981), the district court did not grant a preliminary injunction to state directors of the Farmers Home Administration because it found that such positions met the *Elrod-Branti* exception. The court found that:

"each State Director is a vital cog in the machinery of a new Administration's formulation and implementation of national farm and rural development policies. More than any other person in the agency, the State Director is in the critical position of insuring either the success or failure of these national policies through the administration of [Farmers Home Administration] programs within his state area. It is certainly expected that these positions would be filled by individuals who will openly support and aggressively implement the policies of the in-

party in the discharge of their duties." *Id.* at 239.

Consistent with these opinions, we find that the Regional Director acts as the Executive Director's representative at the regional level. They "develop, plan, coordinate, revise, and monitor the progress of the agency's programs and thus gauge the success of the Administration's [Commonwealth] policies." *See id.* Without the Regional Directors' political sympathy and loyal cooperation, the Executive Director "might face a situation where the hostile efforts or foot-dragging actions of any one of the [eleven Regional Directors] could singlehandedly thwart the Administration's goals in that particular [region]." *See id.* As Justice Powell noted in his dissenting opinion in *Branti,* "if government is to work, policy implementation is just as important as policymaking." 445 U.S. at 530, 100 S.Ct. at 1301.

We think it also of note that the Regional Directors fall within the small category of "confidential" employees under the Puerto Rico Public Service Personnel Act of 1975, 3 L.P.R.A. § 1301 et seq. (1978). The Act establishes a civil service personnel system in which all Puerto Rico government employees are classified into two categories. *Id.* § 1349. Confidential employees, who are of "free selection and removal," are those who "intervene or collaborate substantially in the formulation of the public policy, who advise directly or render direct services to the head of the agency, such as ... Regional directors of agencies." *Id.* §§ 1350 & 1350(4). The larger category is that of career employees, who are selected

strictly on merit and can be removed only for cause. *Id.* §§ 1331–1338.[11]

Although we do not believe a legislature's classification system is determinative of the *Elrod-Branti* question, we do think it is entitled to some deference. *See e.g., Ness v. Marshall,* 660 F.2d 517 (3d Cir.1981). Thus, we think it significant that Regional Directors are among the few positions treated as policymaking within the Commonwealth's personnel system. The Act generally limits the number of confidential positions to twenty-five per agency, *id.* § 1351(3), and only twelve employees from the Program of Public Housing were so designated. Eleven of the twelve were Regional Directors. Within the agency at least, plaintiffs were considered to be at the policymaking end of the spectrum.[12]

At this stage of the proceedings, we think plaintiffs' position of Regional Director of CRUV is one for which, under *Elrod* and *Branti* and the case law of the lower courts, "party affiliation is an appropriate requirement for the effective performance" of the office. 445 U.S. at 518. In light of this conclusion, we need not decide whether the district court erred in finding that the plaintiffs would not have been fired but for their party affiliation.

## IV.

■ As a final matter, we note that the district court did not explicitly reach a contrary conclusion about the partisan nature of the position of Regional Director. Rather, it seems to have based its decision primarily on the fact that it had not been

---

11. When appointed to confidential positions, career employees retain their right to career positions. If removed from their confidential positions, they must be reinstated to their previously-held career positions, as occurred in this case.

12. The district court found, as a result of the testimony of Jorge Guillermety, former Associate Director of Public Housing, that "there is little discretion involved in the position of Regional Director." Guillermety, who was dismissed by the PPD and has since instituted his own suit for reinstatement, testified that political affiliation is not a requisite for the position

of Regional Director because anyone with an Engineering, Public Administration or Social Services degree can qualify for the position, and because the functions of the job are clearly and specifically set forth in the rules of the Agency. That anyone with a particular masters degree could qualify for a position seems to us to have little, if any, bearing on the question of whether political affiliation is appropriate. Moreover, that the functions of the job are clearly set forth does not mean that little discretion is involved in the job. In fact, those functions reveal a great deal of discretion.

convinced that termination based on political affiliation is justified when the administration could invoke the "simple expediency of disciplining or removing an employee who fails to abide by an Executive Order which reflects the program of the Administration regardless of the employee's political affiliation."[13]

By requiring a government employer to terminate an unprotected employee only upon cause, the district court ignored the teachings of *Elrod*. In *Elrod*, the plurality scrutinized two government interests that were offered in defense of the patronage practice. The first interest was the "need to insure effective government and the efficiency of public employees." The defendants argued that employees not belonging to the party of the administration would lack the incentive to work hard and might be motivated to subvert the administration's efforts to govern effectively. 427 U.S. at 364, 96 S.Ct. at 2685. The plurality rejected this interest because, *inter alia*, less drastic means than political termination exist for serving this interest. "Specifically, employees may always be discharged for good cause, such as insubordination or poor job performance, when those bases in fact exist." *Id.* at 366.

In contrast, the second articulated interest—the need for political loyalty so that the administration can carry out policies sanctioned by the electorate—was found valid by the plurality, as it might be applied to policymaking positions. In *Branti*, as we know, the Court subordinated resort to the policymaking and confidential labels to a more functional analysis. 445 U.S. at 518, 100 S.Ct. at 1294. When, therefore, a partisan termination is defended on this ground, there is no requirement that the employer wait for cause to dismiss an employee of a different party; rather, to insure that representative government not be undercut, these employees may be dismissed without cause. Otherwise, indeed, the *Elrod-Branti* exception would have no reason for being. The district court seemingly ignored this implication, accepting the expert's testimony that political affiliation may be appropriate but deciding that the interest could be served by dismissing employees when the employee acts in a manner obstructive of the administration.

We therefore hold that the district court abused its discretion in finding that the plaintiffs had shown a likelihood of success on the merits of their wrongful termination claim. *The grant of the preliminary injunction is reversed.*

*Appendix*

Job Description for Regional Director

"1.  Directs, plans and supervises the operational and administrative activities of the Region, such as: Accounting, Personnel and Occupation, Maintenance, Modernization, Community Labor, Management and Section 8.

2.  Reviews and signs the reports submitted to the Central Office, HUD and other related agencies.

3.  See [sic] to it that the norms and regulations are complied with in accordance to the philosophy of the Public Housing Administration and the HUD Federal Agency.

4.  Arranges periodic meetings with supervisory personnel to counsel and inform as to changes in norms and regulations and/or new work guidlins [sic] and other matters.

5.  Reviews, approves and signs the reports on rent changes, which are sent to the Federal Agency, Central Office of the Housing Department and other agencies; reports on Accounting purchase orders, disbursements, functional budgets of the Region and preliminary budget of maintenance works and others.

6.  Attends, representing the Agency, to meetings with other government officers or civic leaders from the community in

---

**13.**  We note that this is the same approach taken by the Puerto Rico Supreme Court.  In *Colon v. CRUV*, 84 J.T.S. 52 (P.R.1984), the Court suggested that the plaintiff, "although his functions were confidential in nature," could be removed only if he "turn[ed] his back on the requirements of his functions as a public servant." *Id.* at 21.

*Appendix*—Continued

order to discuss and coordinate the implementation of Social Services, economics, health and other type of services offered to public housing residents and programs of the Housing Department.

7. Drafts reports related to the work performed.

8. Drafts correspondence for the signature of the Associate Director and/or CRUV Executive Director.

9. Supervises and evaluates the Supervisors of the different sections attached to the Region.

10. Makes recommendations on personnel recruitment, dismissals, promotions, salary increases and other relations with the Region's employees.

11. Recruits necessary irregular personnel at the Region.

12. Receives and hears residents or general public in problematic cases which have not been solved at a lower level.

13. Performs periodic visits to the housing projects at the Region.

14. Attends periodic meetings with the Associate Director, to discuss problems related to the operations of the Region.

15. Offers recommendations to the Executive Director to improve the services rendered by the Program.

16. Arranges meetings with residents and/or organized groups in the community for the coordination of social activities.

17. Plans and organizes training for the Region's employees in coordination with the Training Committee.

18. Receives telephone calls to give or receive information related to the Region's operations.

19. Is responsible for the preparation and control of the functional budget of the Region.

20. Performs any task as assigned."

BAILEY ALDRICH, Senior Circuit Judge, concurring.

As the writer of the panel opinion which is now reversed, I am not at all personally unhappy with this result. I can believe, too, that quite possibly we were too strict, so far as the present plaintiffs are concerned.

At the same time, with great respect to my brethren, I cannot but wonder if some parts of the present opinion read more like the, admittedly provocative, *Branti* dissent than the majority opinion. It is of course true that a change of party at the polls may be stimulated by "lackluster" performance, but this is the age-old excuse— or reason—for patronage. The proper balance is elusive. I worry about the court's broad, and I suggest, unnecessary, generalizations about "lack-luster," and its complement "tough and aggressive." These are personal attitudes, far beyond party. Any employee outside of civil service can be discharged for lackadaisical performance. To what extent are there to be classifications where non-party membership is the equivalent?

I am particularly doubtful about invoking the Puerto Rico Personnel Act. Since I believe my court would be quick to say that, from the constitutional standpoint, this act goes too far, how is it persuasive in some individual case though not in others? And, finally, is not the court overinclusive in categorizing "a privy to confidential information"? All sorts of low level employees may be mechanically privy. Surely ability to keep confidences should not be determined by party affiliation.

With the customary freedom of a judge speaking for himself to express his personal mind, I could hope that the Supreme Court might see fit to liberalize its *Branti* views, but, again with respect, I wonder, in the meantime, if my court's guidance may not have preceded it. In particular I agree with my brother Torruella's aspersions against the Seventh Circuit's decision in *Tomczak v. City of Chicago,* 765 F.2d 633 (7th Cir.1985).

TORRUELLA, Circuit Judge (dissenting).

Although I realize that the majority's task in attempting to define when political

affiliation is "appropriate" to a governmental task is not an easy one, I suggest that this burden has not been lightened by its refusal to give due weight to the most relevant reference available in this particular case. *See Colón v. CRUV*, 84 J.T.S. 52 (P.R.1984).

Undoubtedly influenced by the inflated assertions of appellants regarding an alleged egregious volume of political discharge cases pending before the United States District Court for the District of Puerto Rico, the majority has been induced into granting *en banc* consideration with a view to laying down an all-encompassing rule that will easily resolve these controversies. Unfortunately, the subject of this special attention is a case which both procedurally and factually does not lend itself to such facile disposition. The majority's statement that the " 'conclusions' and 'holdings' as to the merits of the issue presented are to be understood [only] as statements as to probable outcomes," *ante,* at 238, further emphasizes the inappropriateness of using this juncture for the purpose of laying down a pronouncement by an *en banc* court. More importantly, if this is a "tentative" holding, the strained result is additional proof that it contributes little to providing concrete guidelines for future action by the district courts or by governmental administrators.

Although the opinion appeals to "common sense judgment," *ante,* at 241–242, I fail to see how a dispassionate observer can conclude that such a standard was applied herein if we consider that the *majority opinion reaches an opposite conclusion, regarding the same job classification and description, as was reached by three other judicial bodies, e.g.,* the Supreme Court of Puerto Rico, *Colon v. CRUV, supra,* the United States District Court for the District of Puerto Rico, and a panel of judges of *this* Court, 807 F.2d 230 (1st Cir.1985). I do not believe that the present court has a higher claim to common sense than the three judicial bodies that preceded us in deciding this issue. Thus, the majority opinion not only fails to provide cogent guidelines for future action, but completely

unsettles what little law was available to direct the district courts in this delicate area. Furthermore, the observance by the public of such a divergence of results can only cause an erosion of its confidence in the judicial process. *See* Pound, *The Causes of Popular Dissatisfaction With the Administration of Justice,* 20 Journal of the American Judicature Society 170, 183–185 (1936–37) (reprinting of an address delivered by Roscoe Pound in 1906 at the annual convention of the American Bar Association).

When all is said and done, the majority simply does not accept the holding in *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). That case places a *heavy* burden on the side claiming "that party affiliation is an appropriate requirement for the effective performance of the public office involved":

> [U]nless the government can demonstrate 'an overriding interest ... of vital importance' requiring that a person's private beliefs conform to those of the hiring authority, his beliefs cannot be the sole basis for depriving him of continued employment.

*Id.* at 515–516, 100 S.Ct. at 1293. This is not a new rule, the Court in *Elrod v. Burns,* 427 U.S. 347, 362, 368, 96 S.Ct. 2673, 2684, 2687, 49 L.Ed.2d 547 (1975), having indicated that "the [governmental] interest advanced must be paramount," and that "cases of doubt [should be] resolved in favor of the [employee]." *See also Buckley v. Valeo,* 424 U.S. 1, 94, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976). This high standard is overcome in the present appeal by reliance on the flimsiest of evidence and on *Branti*-discarded labels.

Notwithstanding *Branti*'s stricture that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position," *id.* at 518, 100 S.Ct. at 1295, much of the majority's analysis continues to rely on such tokens. *Ante,* at 244–245 ("policymaking"), 245, ("confidential"), 246 ("policymaker," "confidential"). Even assuming *arguendo* the present-day

relevance of these labels, the opinion's deference to Puerto Rico's Legislature in classifying the disputed position within those titles, *ante*, at 246, is particularly disconcerting considering its failure to grant equal treatment to the Supreme Court of Puerto Rico's interpretation of its law. *Ante*, at 243 n. 9. *See Posadas de Puerto Rico v. Tourism Co. of Puerto Rico*, —— U.S. ——, ——, 106 S.Ct. 2968, 2974–76 (1986) (in deciding a First Amendment violation claim, the restrictive interpretation given by the Supreme Court of Puerto Rico to a local statute is entitled to "[a] rigid rule of deference ... given the unique cultural and legal history of Puerto Rico." *Id.* n. 6).

This case also sets bench marks in other respects. We now have "experts" in the field of "appropriateness of political affiliation." Although I would not have thought that this is a matter within the reach of Rule 702, Fed.R.Evid., I will, also *arguendo*, overlook this apparent technicality. It would seem, however, that such factual conclusions as were testified to by Dr. Hirshbrunner are nevertheless subject to the strictures of Rule 52(a) of the Civil Rules, which advises against the setting aside of a trial court's findings of fact, even in "granting interlocutory injunction[s] ... [,] unless clearly erroneous." Rule 52(a), Fed.R.Civ.P. As stated by the original panel majority in this case in upholding the district court's findings, "By this time we need not dwell on the principle that the district court's findings of fact must stand unless clearly wrong." *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d at 231. Notwithstanding the clarity of this statement of principle, in view of the majority's actions I am obliged to remind it of the additional wisdom provided by *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 105 S.Ct. 1504, 1511–1513, 84 L.Ed.2d 518 (1985), also a discrimination case, in which the Supreme Court stated:

> [A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52 if it undertakes to duplicate the role of the lower court ... If the district court's account of the evidence is plausible in light of the record reviewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.* This is so even when the district court's findings do not rest on credibility determination, but are based instead on physical or documentary evidence or inferences from other facts. ... Rule 52 'does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a court of appeals to accept a district court's finding unless clearly erroneous'.
>
> ... But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding if not internally inconsistently can virtually never be clear error.

Citations omitted, emphasis supplied.

The majority violates virtually every prescription in *Anderson*. Unless the original panel of this court was completely misguided, I can state with some assertion that the evidence presented to the district court permits at least two plausible views of the evidence.

It is self-evident that the trial court rejected the "expert's" "opinion" on this matter, as well it might have in view of the facetious nature of this testimony. The "expert's" statement that there are ideological differences between Puerto Rico's

two leading parties regarding the acceptance or non-acceptance of federal funds for public housing, *ante*, at 242, would lead any trier of fact sitting in Puerto Rico to question the reliability of such an assertion. *See* Junta de Planificación de Puerto Rico, *Informe Económico al Gobernador, 1984–85*, San Juan, Puerto Rico (1986), Tabla 19, "Transfers between Puerto Rico and the Federal Government ... Fiscal Years 1972–1985," p. A–19, column entitled "Rent subsidies."

The "expert's" conclusions regarding the need for political affiliation of the job description in question are equally incredulous. The Supreme Court of Puerto Rico, in considering this same position, with an almost identical job description, put it this way:

> It would be difficult to visualize that the faithful and efficient discharge of the duties of Director or General District Supervisor, as listed in OP–16 of the Personnel Office, in the public housing program, would require a determined loyalty to the ideological postulates of a given political party.

*Colón, supra*, at 3628. (My translation). I believe we would be on safe grounds to assume that Puerto Rico's Supreme Court is better qualified to reach this conclusion than appellant's "expert."

Yet, the majority avoids specifically ruling that the district court was clearly erroneous in not giving credibility to the "expert's" tailormade testimony. Of course, if we conclude that the issue of "appropriateness" is a legal one, then the district court had no business in even hearing Dr. Hirshbrunner's opinion, and we, even less in relying upon it as a basis for today's far reaching decision.

Although much is made of the ranking of the regional director's position within CRUV, the majority overlooks the real standing of that position in the hierarchy of the Department of Housing, the umbrella organization within which CRUV is but one of three divisions. Joint Exhibits I and II, reproduced as appendices to this dissent, establish that "regional director" is a bombastic title for a *fifth echelon* government supervisor (their previous title), with *limited territorial and agency jurisdiction*. These, at least, are two distinguishing features from *Tomczak v. City of Chicago*, 765 F.2d 633 (7th Cir.1985), in which the politically-discharged employee occupied the second highest job in a city-wide department. Other cases relied upon by the majority, *ante*, at 244–245, involve employees with agency-wide or statewide authority. The very testimony of plaintiffs Jiménez-Fuentes and Vicente Vázquez, cited as proof their "role as ... policymaker[s]," *ante*, at 244–245, is in fact demonstrative of exactly the opposite: they were sent and told to do a job in a region, *i.e.*, all they did was follow orders and policy established higher up.

Reliance on *Tomczak* in my opinion is not advisable. In addition to the factual distinctions already alluded to, I believe that a holding, which makes the dispensation of water a job in which political affiliation is an "appropriate" requirement for its effective performance, is a highly suspect ruling. I should point out that we shall be the first court outside the Seventh Circuit to even cite *Tomczak*.

Nor do I agree with the majority's labeling or analysis of the job description in this case as leading to a "common sense" conclusion that political loyalty is appropriate to a regional director's job. *Ante*, at 244. Important and relevant portions of that description have been overlooked. *See* Appendix, *ante*, at 247. For example, from paragraph 1 of those functions labelled "policy-making" by the majority, *ante*, at 244, is excluded the fact that the functions therein described merely deal with activities "such as: Accounting, Personnel and Occupation, Maintenance, Modernization, Community Labor, Management and Section 8." *Ante*, at 247. From the next paragraph included by the majority within that label, Paragraph 3, have been omitted those parts dealing with the standard to be applied by the regional directors in monitoring compliance: "the philosophy of the Public Housing Administration and

the HUD Federal Agency." *Ante,* p. 247. If we equate "philosophy" with "policy," the conclusion cannot be avoided but that a regional director *follows,* rather than establishes, public policy. The *discussion* of his region's operational problem with the associate director (No. 14), the *offering of recommendations* on improvement of the services to the Executive Director (No. 15), and the preparation and control of his Region's *functional* budget (No. 19), can only be labelled "policymaking" by a more expanded view of that term than has hereto been prevalent.[1] Requirement No. 15, "[p]erforms any task as assigned," is, if anything, illustrative of the subservient status of regional directors rather than an indication of their "policymaking" prerogatives.

I do not believe that it is necessary or productive to continue an indefinite discussion of the majority's analysis of the job description. A brief reading of the duties classified under the various headings ("Representative Functions," "Spokesperson Functions," "Personnel Duties," "Ministerial Duties"), *ante,* p. 244, reveals that these activities are similar to those carried out by a myriad of low and middle level government executives. If the performance of these functions are sufficient excuse for abrogation of their First Amendment rights under *Branti,* then this Court is opening the flood gates for the swinging of the patronage axe. This will be a judicial throwback to the days of the spoils system, when someone in a position like the regional directors, because they were party hacks responding to selfish partisan interests, could condition the granting of public aid to "appropriate" party affiliation by the recipient. This decision will hardly be a contribution by this court to good government to say nothing of the chilling effect that it will have on the exercise of the associational rights of the thousands of government employees who must now fear its impact.

This is an unfortunate decision. It is the wrong case, the wrong juncture in that case, and the wrong outcome. *Branti, supra; Anderson, supra.*

*Politiae legibus non leges politiis adaptandae.*

I dissent.

---

**1.** *See Elrod v. Burns,* 427 U.S. 347, 368, 96 S.Ct. 2673, 2687, 49 L.Ed.2d 547 (1976):

In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an advisor or formulates plans for the implementation of *broad* goals.

(Emphasis supplied).

United States District Court
For the District of Puerto Rico

— CERTIFIED —

To be a correct translation made
and/or submitted by the interested party

Certified Court Interpreter
Administrative Office of the
United States Courts.

# HOUSING AND URBAN DEVELOPMENT CORPORATION
## PUBLIC HOUSING ADMINISTRATION PROGRAM
### ORGANIZATIONAL CHART

United States District Court
For the District of Puerto Rico

— CERTIFIED —
To be a correct translation made
and/or submitted by the interested party

Certified Court Interpreter
Administrative Office of the
United States Courts

