**Edward COTUGNO, Plaintiff,**

v.

**Bruce SUNDLUN, et al., Defendants.**

**Civ. A. No. 91–0433 P.**

United States District Court,
D. Rhode Island.

Aug. 23, 1995.

William C. Dimitri, Dimitri & Dimitri, Providence, RI, for plaintiff.

John A. Tarantino, W. Mark Russo, Adler, Pollock & Sheehan, Inc., Providence, RI, for defendants.

### MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

Edward A. Cotugno, Jr. instituted this action after being terminated from his position as Executive Director of the Rhode Island Emergency Management Agency ("RIEMA"). He alleges that his layoff was motivated by discrimination on the basis of political affiliation in violation of the First and Fourteenth Amendments of the Constitution. The instant action was stayed pending Cotugno's appeal to the Rhode Island Personnel Appeal Board ("the Board"). The Board denied plaintiff's appeal, and its decision was upheld by the Rhode Island Superior Court. The Rhode Island Supreme Court denied the petition for a writ of certiorari. Defendants moved this Court to enter summary judgment based on the findings of the Board and the Superior Court, invoking the doctrines of res judicata and collateral estoppel. I denied defendants' motion, ruling that although the Board and Superior Court held that Cotugno could be fired at the pleasure of the governor pursuant to state statute, neither proceeding addressed plaintiff's constitutional claim that he was fired in violation of the First Amendment, (that is, fired because of his political affiliation, from a job for which partisan loyalty is an impermissible consideration). I reserved ruling on whether plaintiff could properly be fired as a result of his political affiliation. Defendants now move this Court to address, as a matter of law, this very question. Because I now find, for the reasons set forth below, that party affiliation was a permissible requirement for the effective performance of plaintiff's former position, defendants' Motion for Summary Judgment is GRANTED.

### I.

In 1973, the General Assembly enacted the Rhode Island Defense Civil Preparedness Act (the "Act"). See R.I.Gen.Laws § 30–15–1 to § 30–15.7–5. The Act established the Defense Civil Preparedness Agency, a predecessor to RIEMA. See R.I.Gen.Laws § 30–15–5. RIEMA was established to coordinate and manage disaster preparedness, prevention, response, and recovery. See R.I.Gen. Laws § 30–15–2. The Act further provided for a Director who is subject to the Governor's appointment, direction, and control. See R.I.Gen.Laws § 30–15–5. Plaintiff was employed with the State of Rhode Island as Executive Director of RIEMA.

Governor Sundlun, a Democrat, took office in January of 1991. In the process of reorganizing the executive branch of the government, the Sundlun Administration determined that the *classified* position of "Executive Director" (then filled by Cotugno, a Republican) was inconsistent with statutory law. See Defs.' Ex. B, *Cotugno v. Rhode Island,* Decision of the Rhode Island Superior Court, March 17, 1994 at 4 ("Superior Court Decision"). The statute dictated that the *unclassified* Director of the Agency serve at the pleasure of the governor. The Sundlun Administration abolished the classified position, terminated Cotugno, and appointed a new RIEMA director to serve in the unclassified service at the pleasure of the Governor. Superior Court Decision at 4.

Plaintiff filed a complaint with this Court alleging that he was wrongfully terminated, effective August 3, 1991, in contravention of his First Amendment rights. The instant action was stayed pending a decision by the Board on an issue independent of, although relevant to, the constitutional question before this Court. The issue before the Board was whether, according to state law, plaintiff was properly terminated. In order to make this determination, the Board was required to

evaluate the nature of plaintiff's former employment position. Plaintiff officially occupied the administratively created, classified position of Executive Director of RIEMA, but the "Executive Director" had all the same responsibilities as the statutorily created, unclassified position of "Director of the Agency." R.I.Gen.Laws § 30–15–5.

The Board ultimately determined that the administratively created position of "Executive Director," for which the plaintiff was officially hired on March 11, 1990 and the statutorily created position of "Director of the Agency" were one and the same. The Rhode Island Superior Court affirmed this decision. The Superior Court concluded that, "[a]s a matter of law, the person who fits within the definition of the Director of the Agency under § 30–15–5 is in the unclassified services and serves at the pleasure of the Governor." Superior Court Decision at 10.

Thus, I must consider the job descriptions of *both* the classified Executive Director and the unclassified Director in determining, for the purposes of my First Amendment analysis, the nature of plaintiff's job.

The plaintiff filled the directorship of RIEMA, which, as noted above, was established to coordinate and manage disaster preparedness, prevention, response, and recovery. R.I.Gen.Laws § 30–15–2. The Act sets forth the duties of the Director as follows:

> There is hereby created within the executive department, the Rhode Island defense civil preparedness agency (hereinafter in this chapter called the "agency"), to be headed by a director (hereinafter in this chapter called the "director") who shall be appointed by and serve at the pleasure of, the governor, and who shall be in the unclassified service.
>
> . . . .
>
> . . . .
>
> The director, subject to the direction and control of the governor, shall be the executive head of the agency, and shall be responsible to the governor for carrying out the program for disaster preparedness of this state. The director shall coordinate the activities of all organizations for disas-

ters within the state, and shall maintain liaison with and cooperate with disaster agencies and organizations of other states and of the federal government. The director shall have such additional authority, duties, and responsibilities authorized by this chapter as may be prescribed by the governor.

R.I.Gen.Laws § 30–15–5. In essence, the statutorily established Director of the Agency is required by statute to:

1) carry out the State's program for disaster preparedness;

2) coordinate the activities of local emergency management agencies ("EMA's");

3) maintain a liaison with the Federal Emergency Management Agency ("FEMA"); and

4) hold an ex-officio position on the Defense Civil Preparedness Advisory Council.

Defs.' Ex. A, Decision of the Personnel Appeal Board, June 16, 1992 at 9 ("Decision of the Board").

Plaintiff was originally hired for the administratively created, classified position of "Executive Director" of RIEMA. Superior Court Decision at 3. As a result, I also examine the official job specification for the Executive Director to describe fully the nature of plaintiff's job position. Illustrations of the duties of the Executive Director include but are not limited to:

1) insuring conformance with state and federal laws, rules and regulations;

2) establishing and maintaining an adequate operating budget from state and federal funding;

3) maintaining a liaison and conducting regular seminars and conferences with local emergency management agencies;

4) establishing and promulgating procedure for compliance with federal emergency disaster response and recovery programs; and

5) implementing the Governor's programs and policies.

Decision of the Board at 6–7.

## II.

A public employee who alleges that he or she was discharged because of political

affiliation states a claim under the First and Fourteenth Amendments. *Elrod v. Burns,* 427 U.S. 347, 348, 96 S.Ct. 2673, 2677, 49 L.Ed.2d 547 (1976). However, a government employee will not be protected from a patronage dismissal where "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980). The First Circuit has amassed a sizable body of case law addressing such dismissals, embracing a two-part test for determining whether a particular position is exempt from First Amendment protection. The threshold inquiry is whether the position relates to "partisan political interests ... [or] concerns." *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236, 241 (1st Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987) (quoting *Branti,* 445 U.S. at 519, 100 S.Ct. at 1294). More specifically, a court must determine whether the functions of the employee's agency involve "decisionmaking on issues where there is room for political disagreement on goals or their implementation." *Jimenez Fuentes,* 807 F.2d at 241–42. The First Circuit has also considered such factors as whether the employee's agency dealt with matters potentially subject to political differences and the extent to which the employee's position influenced the resolution of these issues. *Mendez–Palou v. Rohena–Betancourt,* 813 F.2d 1255, 1258 (1st Cir.1987).

Case law reflects the First Circuit's expansive interpretation of that which relates to "partisan political interests ... [or] concerns." *Branti,* 445 U.S. at 519, 100 S.Ct. at 1294. For example, the Court of Appeals has found that positions that appear to be inherently devoid of partisan interests nevertheless meet the *Branti* standard. In *Mariani–Giron v. Acevedo–Ruiz,* 877 F.2d 1114 (1st Cir.1989), the Court discussed this principle in the context of Puerto Rico's Civil Defense Agency and its Zone Coordinator:

> To be sure, the CDA is a public safety agency and presumably not "political" in the traditional sense of the word.... [However], "[h]igh level officials of major service-oriented departments in municipal and state government must adequately

take into account competing public needs, matching them with available resources. They must react with sensitivity to anticipated, or actual, public criticisms of their decisions—all of which is to say that they have *politically sensitive* jobs."

*Mariani–Giron,* 877 F.2d at 1118–19 (quoting *Figueroa–Rodriguez v. Lopez–Rivera,* 878 F.2d 1478, 1484 (1st Cir.1989)) (emphasis in original). The Court has consistently rejected "an unduly myopic view of the role of politics in the seemingly apolitical context of universal provision of services." *Tomczak v. City of Chicago,* 765 F.2d 633, 641 (7th Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985). As the Seventh Circuit noted, and as the First Circuit has reiterated:

> Elections often turn on the success or failure of the incumbent to provide these services, and, as campaigns develop, the opposing sides put forth varying proposals about how best to provide services. While the ultimate goal of both sides might be the same, there is clearly room for principled disagreement in the development and implementation of plans to achieve that goal.

*O'Connor v. Steeves,* 994 F.2d 905, 910 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 634, 126 L.Ed.2d 593 (1993) (quoting *Tomczak,* 765 F.2d at 641).

If a Court determines that the first inquiry is satisfied, it subsequently examines the employee's professional responsibilities to determine whether they are consistent with those of "a policymaker, a privy to confidential information, a communicator, or some other office holder." *Jimenez Fuentes,* 807 F.2d at 242. In making this determination, the First Circuit has considered such factors as " 'relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders.' " *Jimenez Fuentes,* 807 F.2d at 242 (quoting *Ecker v. Cohalan,* 542 F.Supp. 896, 901 (E.D.N.Y. 1982)). The First Circuit has instructed that a Court must examine the powers inherent to

the employee's position rather than those actually exercised by the employee. *Jimenez Fuentes*, 807 F.2d at 242 (citing *Tomczak*, 765 F.2d at 641). While a legislature's classification system is not dispositive of the character of the office, it is entitled to some deference. *Jimenez Fuentes*, 807 F.2d at 246.

### III.

■ It is plaintiff's position that he was fired because of his political affiliation, in contravention of the First Amendment. Defendants, however, argue, without conceding, that even if the plaintiff were fired for political reasons, the termination would be constitutional because his former job position falls within a First Amendment exception to the general prohibition of termination for political affiliation.[1]

The plaintiff is not protected from a patronage dismissal if the RIEMA directorship meets the First Circuit's two-part test. As noted above, the threshold inquiry is whether or not the functions of RIEMA involve "decisionmaking on issues where there is room for political disagreement on goals or their implementation." *Jimenez Fuentes*, 807 F.2d at 241–42. Secondly, I must consider the extent to which plaintiff's position resembles "a policymaker, a privy to confidential information, a communicator, or some other office holder." *Jimenez Fuentes*, 807 F.2d at 242.

Given the First Circuit's expansive interpretation of what constitutes "partisan issues ... [or] concerns," I must conclude that RIEMA dealt with matters potentially subject to political differences. Like the fire department in *Figueroa–Rodriguez*, RIEMA's activities "can produce critical, and public, reexamination of whether, for example, the Department devoted adequate resources to safety checks, whether it had the capacity to respond rapidly enough, or whether it distributed its resources and services efficiently and sensibly among different

neighborhoods." *Figueroa–Rodriguez*, 878 F.2d at 1484.

It is also clear that in his position as director, plaintiff had inherent authority to exert great influence over RIEMA programs, maintain substantial contact with elected officials, and be responsive to political leaders. *See Jimenez Fuentes*, 807 F.2d at 242 (citation omitted). For example, as Executive Director plaintiff was responsible for "*establishing* and *promulgating* procedure for compliance with federal emergency disaster response and recovery programs." Decision of the Board at 6–7 (emphasis added). The Director's duties include maintaining a liaison with the disaster relief organizations of Rhode Island, of other states and of the federal government. *See* R.I.Gen.Laws § 30–15–5. Finally, the statute states that the Director of the Agency "shall be *responsible to the governor* for carrying out the program for disaster preparedness" in Rhode Island. R.I.Gen.Laws § 30–15–5 (emphasis added).

In sum, the directorship of RIEMA is "an upper management level position in an agency required to discharge vital responsibilities in concert with state and local municipalities and agencies, and whose performance during emergencies will attract great public attention and scrutiny." *Mariani–Giron*, 877 F.2d at 1118. I am persuaded that "party affiliation is an appropriate requirement for the effective performance" of the directorship of RIEMA. Defendants did not violate Edward Cotugno's First Amendment rights by discharging him when Governor Sundlun took office.

### IV.

For the foregoing reasons, defendants' Motion for Summary Judgment is GRANTED.

SO ORDERED.

---

1. Plaintiff makes numerous factual allegations in support of his claim that he was fired for political reasons. *See* Pls.' Ex. 1, Mem. in Support of Pls.' Obj. to Defs.' Mot. for Summ.J. at 5. However, because this Court agrees with the defen-

dants that it was constitutionally permissible to consider party affiliation in hiring for the plaintiff's former position, it is not necessary for this Court to decide this issue.